OPINION OF THE COURT
Gabrielli, J.
In the instant appeal, we are called upon to retrace some of the fundamental principles of contract law and to determine whether defendant’s written promise to indemnify his coshareholders against disproportionate loss was supported by legally sufficient consideration. Inasmuch as the promise by defendant induced his coshareholders to incur a specific, “bargained for” detriment, we conclude that there was sufficient consideration for his promise and that the promise is therefore enforceable at law, notwithstanding the fact that defendant may have enjoyed no direct benefit as a result of the bargain.
Each of the parties in the present appeal was a shareholder in Mobile Modular Industries, Inc., a corporation which was formed by them in 1970. Approximately one year after its formation, the corporation, finding itself in need of additional capital, approached the First National City Bank of Binghamton and requested a loan. First National City agreed to extend the corporation a $100,000 line of credit, but insisted that each of the shareholders of the corporation, in exchange, execute a personal guarantee for the full amount of any moneys actually loaned to the corporation. Most of the shareholders, including plaintiffs, complied with the bank’s request and executed individual guarantees *294 which committed them to repaying the bank personally in the event that the corporation defaulted. Defendant, however, failed to make a similar commitment to the bank.
In conjunction with the execution of these guarantees, all of the shareholders, including defendant, also entered into a cross-indemnity agreement, in which each promised to contribute a pro rata share of the loss if any one of their number was held liable to the bank as a result of his personal guarantee for the full amount of the loan. The agreement provided, in pertinent part, as follows:
“whereas, the Guarantors are each stockholders of Mobile Modular Industries, Inc. * * * and,
“whereas, as an inducement for and as a condition of the grant of a line of credit in a total amount not to exceed $100,000.00 * * * the Guarantors have jointly and severally guaranteed the payment of Mobile Modular’s default * * * and
“whereas, by the virtue of the aforesaid joint and several Guaranty, the Bank, in the event of Mobile Modular’s default * * * has the right to seek recovery for the entire loan from anyone and less than all of the Guarantors; and
“whereas, the Guarantors are desirous of avoiding and protecting against any event whereby less than all of them would be held other than proportionately liable for the aforesaid Guaranty and to provide by this Agreement an indemnification by and to each other to accomplish such result.
“NOW, therefore, in consideration of the promises and of the mutual promises herein contained, and other good and valuable consideration, it is agreed as follows:
“1. The limit of any one Guarantor’s liability under the Guaranty shall not exceed [his] proportionate share * * * unless any Guarantor becomes bankrupt or insolvent, in which event any resulting deficiency shall be paid by the solvent Guarantors in proportion to their liability for the loss.
“2. In addition, each Guarantor agrees to indemnify and hold the other Guarantors harmless to the extent of his proportionate share of the liability for the loss (unless any Guarantor becomes bankrupt or insolvent) in the event *295 [that] any one or more but less than all of the Guarantors are required to pay or pays the loan to the Bank”.
The corporation defaulted on its obligation to the bank in 1973, and the bank promptly sought payment from the individual guarantors, eventually recovering the full outstanding amount from six of the Mobile Modular shareholders. These six shareholders, in turn, attempted to recover the amounts they had paid in excess of their pro rata shares by demanding contribution from their coshareholders in accordance with the above-quoted cross-indemnity agreement. The instant lawsuit ensued when defendant declined to honor his pledge under the agreement.
Upon cross motions by the parties for summary judgment, Special Term held in favor of plaintiffs, rejecting defendant’s argument that his promise to indemnify plaintiffs was unenforceable due to a lack of legally sufficient consideration. With respect to defendant’s argument that he could not be held liable on his promise to indemnify plaintiffs because he had never executed a personal guarantee in favor of the bank and therefore could not have benefited from plaintiffs’ reciprocal promises to indemnify him, Special Term simply held that he should be estopped from denying that he was a guarantor, since he had represented himself as a guarantor in the cross-indemnity agreement and had induced the other shareholders to act in reliance upon his representation. Accordingly, Special Term granted judgment for plaintiffs in the amount demanded in their complaint.
The Appellate Division affirmed the judgment of Special Term, with two Justices dissenting. In response to defendant’s contention that his promise was unsupported by legally sufficient consideration, the Appellate Division observed that “[djefendant benefited when the bank loaned the funds to the corporation and all the stockholders who signed the cross indemnification agreement assumed potential liability to each other” (75 AD2d 676, 677). Thus, the court reasoned, plaintiffs had, in fact, conferred a benefit upon defendant, rendering his promise to indemnify them fully binding.
We agree with the Appellate Division that the judgment *296 in favor of plaintiffs should be affirmed, but we would employ a slightly different line of reasoning in support of our conclusion. Defendant maintains that his promise to indemnify plaintiffs cannot be enforced because their return promises to indemnify him against excess liability to the bank were essentially meaningless. This conclusion flows logically from the fact that defendant had never signed a personal guarantee covering the corporation’s debt to the bank and, consequently, could not have been held liable to the bank if the corporation defaulted. Inasmuch as he could not have realized any direct benefit as a result of plaintiffs’ promises to indemnify him, defendant argues, those promises cannot be treated as legally sufficient consideration for his promise to indemnify plaintiffs.
The central fallacy in defendant’s argument is its implicit assumption that the abstract concept of legally sufficient consideration necessarily entails a benefit flowing to the promisor. This assumption is without support either in the historical roots of the doctrine of consideration or in its contemporary application. Indeed, the modern requirement that a promise be supported by legally sufficient consideration cannot be understood without reference to the ancient forms of action and the related rules of pleading.
During the early phases of the development of English common law, an action on an obligation other than one embodied in a sealed instrument was maintainable only through a writ to recover on a debt. The availability of such writs, however, was limited to those narrow situations in which one of the parties withheld payment of a fixed, bargained for sum of money after the other party had performed his part of the bargain by making a loan or delivering goods or services. The underlying theory of the action was that the parties had made a bargain or had agreed upon a quid pro quo exchange and the promisor or debtor was now wrongfully withholding the property of the promisee by refusing to make payment after receiving that which he had bargained for. It was from this concept of a bargained for quid pro quo that the notion of consideration as a benefit flowing to the promisor was derived (see 1 Corbin, Contracts, § 121; Morgan, Introduction to the Study of Law [2d ed], pp 92- *297 93; 1 Williston, Contracts [Jaeger 3d ed], §99; Holmes, Early English Equity, 1 LQ Rev 162, 171).[1]
The action on a debt, however, proved unsatisfactory for a variety of reasons, not the least of which was its limited scope.[2] Litigants, as a consequence, turned with increasing frequency to the vehicle of assumpsit, which was originally a simple variant of trespass on the case, the forerunner of our modern tort cause of action (see Ames, History of Assumpsit, 2 Harv L Rev l).[3] Although assumpsit ultimately evolved into a separate and distinct form of action, its earliest uses were confined to claims based upon malfeasance or faulty performance of an assumed duty (see Williston, at p 384).[4] Consistent with its origins in trespass on the case, *298 the gist of the action in assumpsit remained the injury to the promisee resulting from the promisor’s misconduct in improperly performing his obligation. It was apparently not until 1588 that assumpsit was definitively expanded to encompass actions for nonfeasance or simple failure to perform a contractual duty. In that year, it was held that “a promise against a promise will maintain an action upon the case [in assumpsit], as in consideration that you do give me £ 10 on such a day, I promise to give you £ 10 such a day after” (Strangborough and Warner’s Case, 4 Leon 3, 74 Eng Rep 686 [QB]). With this expansion in the availability of assumpsit, the original requirement of an injury resulting from misfeasance was broadened, and an action in assumpsit could thereafter be maintained upon a showing of any detriment, loss or disadvantage to the promisee arising from the bargain (see, generally, Holdsworth, Debt, Assumpsit and Consideration, 11 Mich L Rev 347).
The final critical development in the law of assumpsit occurred in 1602 with the decision in Slade’s Case (4 Coke 91a, 92b, 76 Eng Rep 1072, 1074 [KB]). That decision paved the way for litigants to sue in assumpsit on claims for fixed sums of money previously maintainable only in the older form of an action based on a quid pro quo to recover a debt (see Moses v Macferlan, 2 Burr 1005, 1008, 97 Eng Rep 676 [KB]). As a result of this development, assumpsit became the primary vehicle for litigation on contractual obligations, and the notion of “consideration” became a term of art encompassing both a benefit to the promisor, the equivalent of the former quid pro quo, and a detriment to the promisee, the equivalent of the former requirement of injury in actions sounding in assumpsit (see Williston, at pp 368-369).* **[5]
*299 This dual notion of consideration as either a benefit to the promisor or a detriment to the promisee has persisted to the present day and has become an integral part of our modern approach to the enforceability of contracts. Thus, it has repeatedly been stated that “ ‘ [a] valuable consideration may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other’ ” (Rector of St. Mark’s Church v Teed, 120 NY 583, 586, quoting 3 Am & Eng Cyclopedia of Law, p 831; accord Allegheny Coll. v National Chautauqua County Bank of Jamestown, 246 NY 369, 373; Walton Water Co. v Village of Walton, 238 NY 46, 50-51; Union Bank of Brooklyn v Sullivan, 214 NY 332, 339; Restatement, Contracts 2d, §75). Indeed, we have expressly held that a promisee who has incurred a specific, bargained for legal detriment may enforce a promise against the promisor, notwithstanding the fact that the latter may have realized no concrete benefit as a result of the bargain (Melville v Kruse, 174 NY 306; Hamer v Sidway, 124 NY 538).
Under this broader view of the doctrine of consideration, there can be no doubt that the contract at issue in this case is enforceable against defendant Feigenbaum. First and most obviously, consideration to support defendant Feigenbaum’s promise to indemnify plaintiffs may be found in plaintiffs’ contemporaneous promises to indemnify each of their fellow shareholders against excess loss in the event that Mobile Modular defaulted on its obligation to the bank. While these promises may not have had any potential value to defendant since he was not personally at risk in connection with the loan to the corporation, it cannot be denied that they represented a detriment to plaintiffs, who had assumed the added duty of sharing the cost of the corporation’s default with each of the other shareholders by virtue of the cross-indemnity agreement. Since this detriment was precisely what defendant had bargained for under the terms of that agreement,[6] he cannot now avoid his own promise by *300 claiming that it was not supported by legally sufficient consideration.
Consideration for defendant’s promise may also be found in plaintiffs’ separate promises to the bank to assume personal liability for Mobile Modular’s obligation upon that corporation’s default. These promises to the bank were identified in the cross-indemnity agreement as part of the consideration for the signatories’ mutual promises to indemnify each other against excess loss. Once again, although defendant argues that these promises to the bank cannot constitute consideration because they did not accrue directly to his benefit (but see Union Bank of Brooklyn v Sullivan, 214 NY 332, supra), such arguments are unavailing, since plaintiffs’ separate promises to the bank clearly constituted consideration in the sense of a legal detriment incurred by the promisee.
Finally, we find no merit to defendant’s contention that summary judgment is inappropriate in this case because there remains a triable issue of fact concerning the sequence in which the various personal guarantees and the cross-indemnity agreement was executed.* *[7] Section 5-1105 of the General Obligations Law provides that “[a] promise in writing and signed by the promisor * * * shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed”. Thus, even if it is assumed that defendant’s promise to indemnify plaintiffs pursuant to the cross-indemnity agreement was obtained after plaintiffs executed their personal guarantees to the bank, defendant’s promise would remain enforceable, *301 since the “past consideration”, plaintiffs’ guarantees, was clearly identified in the cross-indemnity agreement as part of the consideration for defendant’s present promise to indemnify.
For all of the foregoing reasons, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler, Fuchsberg and Meyer concur.
Order affirmed.

. It has been suggested that the notion of consideration as a benefit flowing to the promisee may also be traced to the concept of causa in Roman civil law (1 Corbin, Contracts, § 111, p 495; 1 Williston, Contracts [Jaeger 3d ed], § 99, pp 367-368, n 1; Lorenzen, Causa and Consideration in the Law of Contracts, 28 Yale LJ 621; Salmond, History of Contract, 3 LQ Rev 166, 178).

. The “debt” form of action was also undesirable to many potential plaintiffs because the procedural rules associated with such actions often permitted the defendant to invoke the ancient method of trial by “wager of law” rather than trial by jury. Under the “wager of law” system, the individual accused of owing a debt could successfully defend against the accusation by solemnly swearing that he owed no debt and by supporting his oath with the sworn statements of “oath helpers” that his own oath was “clean and unperjured”. Each of the statements offered on behalf of the defendant was a mere ritualistic recitation of an established formula, and cross-examination of the defendant’s “oath helpers” was not permitted. Needless to say, this system was less than conducive to ferreting out the truth (see 1 Corbin, Contracts, § 121, pp 522-523; Field and Kaplan, Materials for a Basic Course in Civil Procedure [3d ed], pp 272, 276; Maitland, Forms of Action at Common Law [1936 ed], pp 15-19).

. The form of action known as trespass on the case was often utilized when the defendant had negligently caused damage to a chattel entrusted to his care. In such cases, the pleader would often allege that the defendant had undertaken to act carefully (assumpsit), presumably in order to avoid the charge that he had also been at fault in entrusting his property to the defendant. In any event, it seems fairly certain that this allegation of assumpsit was the forerunner of the subsequently developed writ of assumpsit, which became the primary vehicle for recovering for misperformance or nonperformance of a contractual duty (see Field and Kaplan, Materials for a Basic Course in Civil Procedure [3d ed], p 277).

. Among the earliest cases laid in assumpsit were cases involving a ferryman who failed in his undertaking to carry plaintiff’s horse across a river by overloading the boat and allowing the horse to drown, a surgeon who breached his promise to cure plaintiff by administering the wrong medications *298 and a smith who bungled his undertaking to shoe plaintiff’s horse by performing incompetently and laming the horse (see 1 Williston, Contracts [Jaeger 3d ed], § 99, p 368, n 3; Ames, History of Assumpsit, 2 Harv L Rev 1).

. One leading commentator has observed that there is a substantial discrepancy between the notion of an injury to the plaintiff in the ancient law of assumpsit and the notion of “detriment” to the promisee in modern contract law (1 Corbin, Contracts, § 122, p 526; see n 4, supra). Nevertheless, there is little doubt among scholars in the field that our contemporary theories of consideration are derived largely from the pleading rules associated with actions in assumpsit (id.).

. Although defendant made a number of factual assertions in the affidavit submitted in support of his motion for summary judgment, he did not directly challenge the statement in the cross-indemnity agreement identifying plain *300 tiffs’ promises to indemnify their coshareholders as the “bargained for” consideration for his reciprocal promise.

. Defendant has also argued that summary judgment in favor of plaintiffs is improper in this case because there exist triable issues of fact concerning the amount of damages due to plaintiffs under the terms of the cross-indemnity agreement. Inasmuch as defendant failed to controvert plaintiffs’ claim for a specific sum in damages upon his initial motion for summary judgment, however, the issue defendant now raises cannot at this stage of the litigation provide an adequate ground for withholding summary judgment.