**AXA INVESTMENT MANAGERS UK LIMITED, Plaintiff,**

v.

**ENDEAVOR CAPITAL MANAGEMENT LLC and Anthony F. Buffa, Defendants.**

**No. 11 Civ. 3221(PGG)(MHD).**

United States District Court, S.D. New York.

Aug. 24, 2012.

---

374

judgment against defendants Endeavor Capital Management LLC ("Endeavor") and Anthony F. Buffa ("Buffa"), the managing general partner of Endeavor, on a breach-of-contract claim. While Endeavor concedes that it breached the put-option agreements[1] into which it had entered with plaintiff, defendant Buffa asserts that his personal guaranty of these agreements is void for want of consideration. In addition, both defendants argue that the twenty-five-percent interest rate imposed by the liquidated-damages provisions in these agreements is an unenforceable penalty. We find neither of defendants' arguments persuasive and therefore grant summary judgment in favor of plaintiff.[2]

Donald F. Luke, Nabeena Chatterjee Banerjee, Jaffe & Asher LLP, Jeffrey Isaac Zimmerman, Liddle & Robinson, LLP, New York, NY, for Plaintiff.

Ronald Barry Weisenberg, Richard B. Weisenberg, P.C., New York, NY, for Defendants.

## MEMORANDUM & ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge.

Plaintiff AXA Investment Managers UK Ltd. ("AXA") has moved for summary

## BACKGROUND

On May 12, 2009, plaintiff and defendants entered into two put-option agreements[3] in which two "AXA-related companies" acquired from Endeavor shares of stock in Clean Air Power, Ltd. ("CAP"), on the condition that Endeavor agree to repurchase the shares should AXA elect to exercise its option. (*See* Decl. of Ronald B. Weisenberg in Opp'n to Mot. for Summ. J. or in the Alternative, Mot. for Default ("Weisenberg Decl.") Exs. A & B ("May 2009 Agreements") at 1[4]). In these agree-

---

1. A put option agreement is a common investment instrument:

 [A put] option writer [Endeavor in the present case] is one who agrees . . . to buy stock on or before a fixed date at a fixed price. . . .
 The option writer receives a premium. . . . In the case of a put option, the writer profits from an unexercised option if the market price of the shares remains the same or rises; if the price of the shares declines, the writer exercises the option and offsets the loss incurred with the premium received.

 *In re Elizabeth H. Todd,* 1981 WL 16000, *2 (N.Y. Dep't Tax. & Fin. Mar. 2, 1981).

2. Because of this determination, we do not reach plaintiff's alternate motion for a default judgment.

3. The two agreements differ only in the amount of stock that they control and the particular AXA-related companies involved. They are indistinguishable with respect to their relevant provisions—the guaranty by Buffa and the default interest rate.

4. Because the two Agreements are identical in all relevant aspects, we cite them together as the May 2009 Agreements. The same applies to the parties' December 2010 Agreements (Weisenberg Decl. Exs. D & E) and

ments, a clause entitled "Miscellaneous" states in part that "Anthony F. Buffa in addition to being a party to this agreement, is also personally guaranteeing that Endeavor will honor and perform in the full payment of the Put if exercised by the Optionee, and will honor all rights of the Optionee under this agreement." (May 2009 Agreements ¶ 5). On July 29, 2010, plaintiff formally notified defendants of its intention to exercise its options under these agreements. (Weisenberg Decl. Ex. C). Defendants concede that they did not purchase the stock and that "Endeavor was unable to satisfy its obligations under the May 2009 Agreements." (Weisenberg Decl. ¶ 4; *see also* Defs.' Stmt. of Undisputed Material Facts ("Defs.' R. 56.1 Stmt.") ¶ 15).[5]

After lengthy negotiations (*see* Compl. ¶ 12), plaintiff and defendants entered into a second set of agreements on December 21, 2010. (Weisenberg Decl. Exs. D & E ("Dec. 2010 Agreements") at 1). Both of the 2010 agreements are entitled: "Amended and Restated Put Option Agreement and Personal Guaranty." (*Id.*). As presaged by the title, these second agreements each contain a provision designated as the "Personal Guaranty by Buffa" (*id.* ¶ 3), and independent signature lines marked: "On the Personal Guaranty," signed "Anthony F. Buffa." (*Id.* at 5). These agreements set January 31, 2011, as the deadline for plaintiff to exercise its option. (*Id.* ¶ 1).

On February 9, 2011, the parties extended their agreements and set a new exercise-by date for the put of July 31, 2011. (Tubbs Decl. Exs. A & B ("Feb. 2011 Agreements") at 1). These agreements again included a discrete provision labeled "Personal Guaranty by Buffa." (*Id.* ¶ 4). They also incorporated a damages provision according to which, upon default by defendants, a twenty-five percent rate of interest would be imposed upon the option price of any stock that AXA did not sell prior to exercising the option. (*Id.* ¶ 10(b)). This interest rate would supercede the ten percent rate imposed from August 1, 2010, as a consequence of defendants' prior default, and would run from the point of the default under the February 2011 Agreements until defendants paid the full amount that they owed plaintiff. (*Id.* ¶¶ 1, 10).

In two missives dated February 25, 2011, AXA provided defendants notice that it had elected to exercise the options. (Weisenberg Decl. Ex. H, at 1, 3; *see also* Tubbs Decl. ¶ 14). Endeavor was to pay by March 7, 2011, but the parties agreed to extend that deadline to March 14, 2011. (*See* Tubbs Decl. ¶ 14). By defendants' own admission, "Endeavor was unable to purchase the CAP stock at the agreed upon price." (Defs.' R. 56.1. Stmt. ¶ 20; Opp'n Mem. at 3). Defendants admit that Endeavor defaulted under the February 2011 Agreements and that they have, to date, made no payments to AXA, but they deny that Buffa has any personal contractual obligation to plaintiff. (Defs.' R. 56.1 Stmt. ¶¶ 7–8, 12). By letters dated March 30, 2011, AXA gave Endeavor and Buffa timely written notice of their defaults. (*Id.* ¶ 10). Plaintiff commenced the present action in response to these defaults, filing a complaint on May 12, 2011.

Subsequent to filing, plaintiff and defendants entered into a period of informal discovery. (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. and/or Default J. ("Pl.'s

---

February 2011 Agreements (Decl. of Josephine Tubbs in Supp. of Pl.'s Mot. for Summ. and/or Default J. ("Tubbs Decl.") Exs. A & B).

5. Defendants' attribution of non-compliance to Endeavor alone reflects their position that Buffa had no contractual obligations toward plaintiff.

Mem.") at 4; Opp'n Mem. at 3). When this process proved fruitless for contested reasons (*see* Pl.'s Mem. at 4; Opp'n Mem. at 3), plaintiff sent defendants a letter dated November 2, 2011, requesting formal discovery under Rule 26 of the Federal Rules of Civil Procedure. (Decl. of Donald F. Luke in Support of Pl.'s Mot. for Summ. and/or Default J. ("Luke Decl.") Ex. J). The parties agree that formal discovery was not completed, but defendants assert that plaintiff was not prejudiced because it had "the relevant information and documents". (Opp'n Mem. at 8).

Plaintiff filed a motion for summary judgment on April 5, 2012. In the alternative, it seeks a default judgment for discovery derelictions.

In support of its Rule 56 motion, plaintiff notes that the damages sought have been reduced "through its sale, in March 2012, of the CAP stock that Endeavor was required to purchase." (Pl.'s Mem. at 31). Having thus mitigated its damages, plaintiff seeks to collect both the difference in price between what it ultimately received for the shares and what defendants had contracted to pay for them and the default interest due under the damages provisions in the Agreements. (Tubbs Decl. ¶ 9). Defendants agree that plaintiff is entitled to the difference between the contracted-for price and the price actually received for the shares. (Opp'n Mem. at 5, 7). They contend, however, that a judgment to that effect would be enforceable only with respect to Endeavor because the alleged guaranty is not binding upon Buffa and that that judgment should not include the twenty-five percent default interest, which they argue constitutes a penalty. (*Id.* at 5–7).

### JURISDICTION, VENUE AND CONSENT TO APPEAR

■ "Diversity jurisdiction exists over 'civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States.'" *Hallingby v. Hallingby*, 574 F.3d 51, 56 (2d Cir.2009) (quoting 28 U.S.C. § 1332(a)(1)). To satisfy the "citizens of different States" requirement, each plaintiff's citizenship must be different from each defendant's citizenship, resulting in complete diversity. *Id.*

■ Here, plaintiff is "a corporation organized and existing under the laws of the United Kingdom, having its principal place of business in London, England" (Compl. ¶ 1), while Buffa is domiciled in Connecticut and Endeavor has its principal place of business in Connecticut. (Compl. ¶¶ 2–3). The parties are therefore completely diverse. The amount currently sought is £670,588.99 plus interest for the period of April 1, 2012 to the date of a judgment in this matter, as well as legal fees and expenses from March 1, 2012 to the date of a judgment. (Tubbs Decl. at 8). We understand that amount, given an exchange rate of £1 = $1.60, to be approximately $1,072,800.00 in U.S. currency, plus the interest, fees and expenses. (*See* Pl.'s Mem. at 3). Consequently, plaintiff satisfies the diversity and the amount-in-controversy requirements for subject-matter jurisdiction.

■ Parties may contractually stipulate to personal jurisdiction and venue. "Jurisdiction by consent satisfies constitutional requirements of due process." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Frasch*, 751 F.Supp. 1075, 1078 (S.D.N.Y. 1990) (citing *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964)). Similarly, contractual provisions designating an agreed-upon venue are widely enforced.

*See, e.g.,* 14D Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3803.1 (3d ed.2012). Indeed, "individuals are free to regulate their purely private disputes by means of contractual choice of forum." *Nat'l Union Fire,* 751 F.Supp. at 1078 (quoting *Red Bull Assocs. v. Best W. Int'l, Inc.,* 862 F.2d 963, 967 (2d Cir.1988)). Pursuant to 28 U.S.C. § 636(c), parties may also consent to the jurisdiction of a Magistrate Judge. *See Roell v. Withrow,* 538 U.S. 580, 585, 123 S.Ct. 1696, 155 L.Ed.2d 775 (2003).

Here, both of the February 2011 Agreements include provisions consenting to the exclusive jurisdiction and venue of federal and state courts located in Manhattan, New York. (Feb.2011 Agreements § 11(d)). Moreover, all parties have consented to the jurisdiction of a Magistrate Judge for all proceedings save trial. (*See* Sept. 19, 2011 Civil Case Mgmt. Plan & Scheduling Order at 1). Accordingly, all preliminary jurisdictional requirements are satisfied, and we turn to an analysis of plaintiff's motion.

## ANALYSIS

### I. *Motion for Summary Judgment*

#### A. *Standard of Review*

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Shade ex rel. Velez Shade v. Hous. Auth. of New Haven,* 251 F.3d 307, 314 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986); *see, e.g., Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Howley v. Town of Stratford,* 217 F.3d 141, 150–51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the recorder, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c)(1); *see, e.g., Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir.2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy his initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., Celotex,* 477 U.S. at 322–23, 325, 106 S.Ct. 2548; *PepsiCo, Inc. v. Coca–Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002) (*per curiam*); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). If the movant fails to meet his initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. *See, e.g., Adickes v. S.H. Kress &*

*Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Giannullo v. City of N.Y.,* 322 F.3d 139, 140–41 (2d Cir.2003).

If the moving party carries his initial burden, the onus of demonstrating a genuine issue of material fact on any such challenged element of its claim then falls upon the opposing party. *See, e.g., Beard v. Banks,* 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548; *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001) (*per curiam* ). In doing so, the opposing party may not rest "upon the mere allegations or denials of [its] pleading," *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti,* 374 F.3d 56, 59–60 (2d Cir.2004) (citation omitted), nor may it rely on merely conclusory factual allegations. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). It must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 75 (2d Cir.2005). Rather, it must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994).

In order to show a "genuine dispute" of material fact, the opposing party must demonstrate that there is sufficient evidence for a reasonable jury to find in its favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 455–56 (2d Cir.2007) (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505). Only if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact" will summary judgment be denied. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9–10 (2d Cir.1983).

### B. *Plaintiff's Initial Burden*

The agreements in issue both contain choice-of-law provisions stating that they "shall be governed by and construed and enforced in accordance with the laws of the State of New York, without reference to the conflict of laws principles thereof." (Feb.2011 Agreements § 11(b)). Accordingly, we look to New York law in assessing the parties' respective arguments.

 Federal courts have consistently found clear contractual agreements to satisfy the initial burden for summary-judgment motions set forth in Rule 56(c)(1)(A). *See Katel Ltd. Liab. Co. v. AT & T Corp.,* 607 F.3d 60, 64 (2d Cir.2010) (noting that summary judgment is appropriate on a contract claim "[w]here the intent of the parties can be determined from the face of the agreement." (internal citations and quotation marks omitted)). Under New York caselaw, contracts are facially clear when they contain unequivocal payment requirements, and proof of failure to meet such requirements is sufficient to satisfy a movant's initial burden in seeking summary judgment. *See, e.g., Deere & Co. v. M.P. Jones Cos.,* 93 A.D.3d 1208, 940 N.Y.S.2d 416, 417 (4th Dep't 2012) (citing *Convenient Med. Care P.C. v. Med. Bus. Assoc.,* 291 A.D.2d 617, 618, 737 N.Y.S.2d 403, 405 (3d Dep't 2002)) ("Plaintiff met its initial burden on the motion by submitting the contract and evidence establishing that defendants failed to make the payments required by its terms."); *E.D.S. Sec. Sys., Inc. v. Allyn,* 262 A.D.2d 351, 351, 691 N.Y.S.2d 567, 567–68 (2d Dep't 1999) (citing N.Y. C.P.L.R. § 3213; *Capital Circulation Corp. v. Gallop Leasing Corp.,* 248

A.D.2d 578, 578, 669 N.Y.S.2d 913, 913 (2d Dep't 1998)) ("The plaintiffs sustained their initial burden ... by submitting proof of the existence of an underlying note, a guarantee, and the failure to make payment in accordance with their terms."). To meet the initial burden in moving for summary judgment on a guaranty, the requirements are identical: "[w]here ... a creditor seeks summary judgment upon a written guaranty, the creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee." *HSH Nordbank AG N.Y. Branch v. Street*, 421 Fed.Appx. 70, 72 (2d Cir.2011) (citing *Kensington House Co. v. Oram*, 293 A.D.2d 304, 304–05, 739 N.Y.S.2d 572, 572 (1st Dep't 2002); *Chemical Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir.1994)).

■ In keeping with New York law regarding the sufficiency of a showing in contract-based disputes, we conclude that plaintiff has amply satisfied its burden by virtue of having proffered the February 2011 Agreements into which it entered with both defendants. These documents both contain explicit liquidated-damages and personal-guaranty clauses, with a separate signature line for the guarantor. (Feb.2011 Agreements §§ 4, 10; p. 9). Both Agreements, moreover, include explicit and unambiguous reference to defendants' default under the original agreements as well as to their obligations. (*Id.* § 8). Furthermore, defendants do not contest that they have defaulted under the February 2011 Agreements and have made no payments to plaintiff. (Defs.' R. 56.1. Stmt. ¶¶ 7–8).

## C. *Defendants' Opposition*

Because plaintiff has satisfied its threshold requirement under Rule 56, it is "incumbent upon the defendant to demonstrate, by admissible evidence, the existence of a triable issue of fact with respect to a bona fide defense." *E.D.S.*, 262 A.D.2d at 351, 691 N.Y.S.2d at 567 (citing *Colonial Commercial Corp. v. Breskel Assocs.*, 238 A.D.2d 539, 539, 657 N.Y.S.2d 940, 941 (2d Dep't 1997)); *see also Teachers Ins. & Annuity Ass'n of Am. v. CRI-IMI MAE Servs. Ltd. P'ship*, 681 F.Supp.2d 501, 505 (S.D.N.Y.2010) (citing *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir. 2001); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65–66 (2d Cir.1997)), *aff'd*, 481 Fed.Appx. 686 (2d Cir.2012).

Defendants offer two arguments in their attempt to shoulder this burden. First, they contend that, "as a matter of law, the purported Buffa personal guarantee is not enforceable." (Opp'n Mem. at 6). Next, they allege that the twenty-five percent default interest rate prescribed by the Agreements amounts to an unenforceable penalty. (*Id.* at 6–7). We consider—and reject—each argument in turn.

### 1. *Defendant Buffa's Personal Guaranty*

The two Agreements contain the same personal guaranty clause:

> Buffa hereby personally, jointly and severally, absolutely and unconditionally guarantees to Optionee and its successors and assigns the prompt and timely (i) payment of all sums due by Endeavor under this Agreement and (ii) performance of all of Endeavor's other obligations under this Agreement. Buffa also further agrees to honor all the rights of Optionee under this Agreement.

(February 2011 Agreements ¶ 4).[6] Defendants observe that this provision "omits

---

**6.** Furthermore, Buffa "represents and warrants to Optionee" that "[t]he personal guar-

any reference to any benefit or forbearance given to Endeavor or Buffa by AXA" (Opp'n Mem. at 6), and that, moreover, "[t]he Agreements do not assert that there were any additional-benefits or forbearance given in exchange for Buffa's personal guaranty." (*Id.*). Reinforcing this failure to mention guaranty-specific consideration, defendants argue, is the fact that "paragraph 8 of the February 2011 Agreements explicitly den[ies] that AXA is waiving any rights, especially with respect to a previously alleged default." (*Id.*). Defendants thus assert that the guaranty clause cannot be deemed binding for want of consideration.[7]

Plaintiff counters that the personal guaranty is a valid provision because "there was considerable consideration running to Endeavor and Buffa for the February 9, 2011 Agreements, and such consideration was specifically acknowledged by both Defendants, both before entering into the Agreements and in the Agreements themselves!" (Pl.'s Reply Mem. of Law in Supp. of Its Mot. for Summ. and/or Default J. ("Pl.'s Reply Mem.") at 5–6). We agree.

█ "Under New York law, guarantees are governed by the rules generally applicable to contracts . . . . Consideration for a guaranty must be expressly or impliedly stated in the instrument, and the instrument must be delivered to and accepted by the guarantor." *Lakhaney v. Anzelone*, 788 F.Supp. 160, 163 (S.D.N.Y.1992) (citing, *inter alia*, *Sun Oil Co. v. Heller*, 248 N.Y. 28, 31–33, 161 N.E. 319, 320 (1928); *Hauswald v. Katz*, 216 A.D. 92, 97, 214 N.Y.S. 705, 710 (1st Dep't 1926)). Significantly, although guaranties do require consideration, they do not require consideration independent of that furnished in support of the contract in which the guaranty is housed. Indeed,

> "[i]t is well established that 'where one party agrees with another party that, if such party for a consideration performs a certain act [f]or a third person, he will guarantee payment of the consideration by such person, the act specified is impliedly requested by the guarantor to be performed and, when performed, constitutes a consideration for the guarantee.' In other words, the consideration received by the primary obligor also serves as consideration for the guarantor."

*Thomas H. Lee Equity Fund V, L.P. v. Bennett*, 2007 WL 950133, *2 (S.D.N.Y. Mar. 28, 2007) (quoting *Dunkin' Donuts of Am., Inc. v. Liberatore*, 138 A.D.2d 559, 561, 526 N.Y.S.2d 141, 143 (2d Dep't 1988) (citations omitted)). "It is settled law that a guarantee executed in exchange for, and as a condition of, a promise to advance funds to a third party in the future, coupled with an actual advance at a later date, is supported by ample consideration." *Steves & Sons, Inc. v. Pottish*, 31 Misc.3d 1227(A), *2, 929 N.Y.S.2d 203, 203 (Sup.Ct. Suffolk Cnty., 2011) (citation omitted). Not only need there be no additional consideration for a guaranty, but, in fact, "[i]t

anty provided herein by Buffa is the valid and binding obligation of Buffa, enforceable according to its terms." (Feb.2011 Agreements ¶ 7).

7. Defendants also assert that "to the extent that parol evidence is relied on to determine this issue, summary judgment is not appropriate." (Opp'n Mem. at 6). The Agreements, however, contain a clear and explicit merger clause: "This Agreement constitutes the entire understanding of all parties hereto with respect to the subject matter hereof." (Feb. 2011 Agreements ¶ 11(f)). Defendants have not challenged the validity of this provision and thus fail persuasively to argue that discussions extrinsic to the contract should inform our determination with respect to the guaranty. We read the guaranty, which is clear on its face, as it is written.

is unusual to state any consideration when a guaranty is added to a signature on a negotiable instrument, which in itself sufficiently shows the nature of the transaction...." N.Y. U.C.C. Law § 3–416, Official Comment (McKinney's 2012).

▮ In cases with fact patterns akin to those of the current dispute, courts have held guaranties to be valid when a defendant company benefits through a contract even if the guarantor experiences no direct personal benefit. In *Shire Realty Corp. v. Schorr*, 55 A.D.2d 356, 390 N.Y.S.2d 622 (2d Dep't 1977), for example, the court held that, when defendants signed a guaranty without which plaintiffs would not have entered into a contract with defendants' personal company, the guaranty was "premised upon ample consideration." *Id.* at 365, 390 N.Y.S.2d at 628. Similarly, in *Dunkin' Donuts*, the court found that a personal guarantee was "given in consideration for the plaintiffs' consent" to the assignment of a lease to a new corporation, and that "[i]t [was] of no moment that the [guarantor] was not a shareholder of the new corporation." 138 A.D.2d at 561, 526 N.Y.S.2d at 143. In *Thomas H. Lee Equity*, finally, the court held that the personal guaranty issued by the former president of a company was supported by ample consideration in the form of company income "regardless of whether the financial benefits flowed directly to [the guarantor]." 2007 WL 950133, at *2. As these cases indicate, a guarantor connected to a corporate entity that stands to profit from a contract is deemed to have received consideration for his or her personal guaranty of the contract by virtue of any advantages that the company might derive from the contract as a whole.

▮ Here, it is beyond question that Endeavor benefitted from the Agreements into which it and Buffa entered with AXA. The original contracts were written for the benefit of both parties, the option being "a precondition of [plaintiff's] purchase of the [CAP shares]". (May 2009 Agreements at 1). The most recent agreements between the parties recite that they were entered into "in consideration of the mutual covenants and promises described below and other valuable consideration [of which] the receipt and sufficiency is hereby acknowledged ...." (Feb.2011 Agreements at 1). These "covenants and promises" include an extension of the option period and an extended payment schedule upon the exercise of the option. (*See id.* ¶¶ 1–2). Because Endeavor was concededly unable to meet its obligation to buy the stock from AXA under the original agreements (Opp'n Mem. at 2), there can be no question that the renewed agreements were supported by adequate consideration in terms both of benefit to the promisor—the granting of further time to make good on its contractual obligation—and detriment to the promisee—the agreement to grant time rather than pursue a legal remedy. Because the contracts as a whole are supported by ample consideration, we conclude, in keeping with New York law, that Buffa's guaranty is, likewise, the product of a bargained-for exchange.

The precise wording of the Buffa guaranty further enhances its patina of validity. First, it purports to be a guaranty of payment, rather than of collection. According to New York Uniform Commercial Code § 3–416:

(1) "Payment guaranteed" or equivalent words added to a signature mean that the signer engages that if the instrument is not paid when due he will pay it according to its tenor without resort by the holder to any other party.

(2) "Collection guaranteed" or equivalent words added to a signature mean that the signer engages that if the instrument is not paid when due he will

pay it according to its tenor, but only after the holder has reduced his claim against the maker or acceptor to judgment and execution has been returned unsatisfied, or after the maker or acceptor has become insolvent or it is otherwise apparent that it is useless to proceed against him.

In stressing that Buffa guarantees *"payment* of all sums due by Endeavor under this Agreement" (Feb.2011 Agreements ¶ 4) (emphasis added), the provision clearly establishes itself as a payment guaranty. This is significant because "New York State courts have long recognized that when a party guarantees payment of a debt, as opposed to collection of a debt, the guaranty is absolute and unconditional." *In re South Side House, LLC,* 470 B.R. 659, 675 (Bankr.E.D.N.Y.2012) (citing, *inter alia, McMurray v. Noyes,* 72 N.Y. 523, 524–25 (1878) (distinguishing a guaranty of payment, which allows a creditor to seek indemnification directly from the guarantor, from a guaranty of collection, which allows a creditor to proceed against the guarantor only after having pursued collection from the principal debtor via legal proceedings)).

Beyond the fact that the guaranty is "absolute and unconditional" by virtue of being a payment guaranty, the provision itself is set forth in these terms: "Buffa hereby personally, jointly and severally, *absolutely* and *unconditionally* guarantees ... payment ...." (Feb.2011 Agreements ¶ 4 (emphasis added)). New York courts have found compelling such direct and express self-designations, noting that it is "[t]he parties' intention, as expressed in the text of the agreement, [that] determines whether [ ] the guaranty is absolute or conditional." *South Side House,* 470 B.R. at 675 (citing *Gen. Phoenix Corp. v. Cabot,* 300 N.Y. 87, 92, 89 N.E.2d 238, 241 (1949)); *N.Y. City Dep't of Fin. v. Twin Rivers, Inc.,* 920 F.Supp. 50, 52–53, *on*

*reargument,* 929 F.Supp. 172 (S.D.N.Y. 1996). The guaranty that Buffa signed is absolute and unconditional, and "[a]bsolute and unconditional guaranties such as those executed by defendant [ ] are consistently upheld by New York courts." *First N.Y. Bank for Bus. v. DeMarco,* 130 B.R. 650, 654 (S.D.N.Y.1991) (citing *Citibank, N.A., et al. v. Plapinger,* 66 N.Y.2d 90, 95–96, 495 N.Y.S.2d 309, 312, 485 N.E.2d 974 (1985); *Chem. Bank v. Sepler,* 60 N.Y.2d 289, 293–94, 469 N.Y.S.2d 609, 610, 457 N.E.2d 714 (1983); *Fed. Deposit Ins. Corp. v. Schwartz,* 78 A.D.2d 867, 868, 432 N.Y.S.2d 899, 901 (2d Dep't 1980), *aff'd,* 55 N.Y.2d 702, 447 N.Y.S.2d 136, 431 N.E.2d 621 (1981)). Accordingly, we find Buffa's guaranty to be a presumptively valid, absolute and unconditional guaranty of payment.

The three cases that defendants cite in their effort to oppose this most straightforward construction of the guaranty do not alter this conclusion. The axiom that "consideration consists of either a benefit to the promisor or a detriment to the promisee," for which defendants cite *Holt v. Feigenbaum,* 52 N.Y.2d 291, 293, 437 N.Y.S.2d 654, 655, 419 N.E.2d 332 (1981) (Opp'n Mem. at 5), cuts against defendants when properly contextualized. The *Holt* court concluded that, "[i]nasmuch as the promise by defendant induced his coshareholders to incur a specific, 'bargained for' detriment ... there was sufficient consideration for his promise and [ ] the promise is therefore enforceable at law, notwithstanding the fact that defendant may have enjoyed no direct benefit as a result of the bargain." *Holt,* 52 N.Y.2d at 293, 437 N.Y.S.2d at 655, 419 N.E.2d 332. Whether or not Buffa benefitted directly from the guaranty he provided, his bargained-for personal guaranty certainly contributed to inducing plaintiff to extend its contractual

relationship with Endeavor. (*See* Pl.'s Reply Mem. at 6–7).

Defendants' second case, when read in full, stands not only for the cited principle that "it is enough," when measuring the adequacy of consideration, "that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him" (Opp'n Mem. at 5 (citing *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 464, 457 N.Y.S.2d 193, 196, 443 N.E.2d 441 (1982) (quoting *Hamer v. Sidway*, 124 N.Y. 538, 545, 27 N.E. 256, 257 (1891)))), but also—and, indeed, more relevantly with respect to the present case—for the principle that, "[f]ar from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promisee." *Weiner*, 57 N.Y.2d at 464, 457 N.Y.S.2d at 197, 443 N.E.2d 441. "[C]ourts have not," as the *Weiner* court notes, "hesitated to find sufficient consideration not only in what is now the proverbial peppercorn, but in a horse or a canary, or a tomtit if [the promisee] chose. In fact, the detriment suffered or the thing promised need be of no benefit to the one who agreed to it." *Id.* (internal citation and quotations). Buffa's alleged lack of personal benefit, even if we assume it to be true, is immaterial given the detriment suffered by plaintiff.

Finally, defendants pin their argument that the Buffa guaranty fails for want of consideration to a felicitous phrase plucked from an irrelevant passage: "[a] personal guaranty is to be interpreted in the strictest manner." (Opp'n Mem. at 5 (citing *White Rose Food v. Saleh*, 99 N.Y.2d 589, 591, 758 N.Y.S.2d 253, 254, 788 N.E.2d 602 (2003) (citations omitted))). Defendants fail to note the context whence this espousal of strict construction hails— in its next sentence, the *White Rose* court explains that "[a] guarantor's obligation cannot be altered without its consent; if the original note is modified without its consent, a guarantor is relieved of its obligation." *Id.* (citations omitted). It is true that a "guarantor's obligation must be 'narrowly construed and cannot be extended by construction beyond the plain and explicit language of the contract.'" *Chase Manhattan Bank v. Am. Nat'l Bank & Trust Co. of Chi.*, 93 F.3d 1064, 1073–74 (2d Cir.1996) (quoting *Key Bank of Long Island v. Burns*, 162 A.D.2d 501, 503, 556 N.Y.S.2d 829, 830 (2d Dep't 1990)). In a recent case, however, a New York court has explained, in dismissing an argument virtually identical to defendants' argument in the matter before us, that the concern underlying the strict-construction principle is that a guaranty within the four corners of a specific contract should not be used to create perpetual indebtedness. *See Wider Consol., Inc. v. Tony Melillo, LLC*, 2012 WL 757030, *3 (Sup.Ct. Queens Cnty., Feb. 26, 2012) ("[W]here a guaranty was for specific debts owed, it could not be used to obligate the guarantor to pay any and all debts that may ever become due and owing to the plaintiff.").

Such concerns are inapposite in the present case, however, which involves neither modification nor unwarranted extension, but rather an unambiguous document whose crystalline terms defendants seek to avoid. The Second Circuit has made it clear that, under New York law, "while '[t]he Liability of a surety cannot be extended-beyond the plain and explicit language of the contract[,] . . . a surety is not entitled to any particular tenderness in the interpretation of the language of his contract.'" *Compagnie Financiere CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir.1999) (quoting 63 N.Y.Jur.2d, Guaranty and Suretyship, § 89 (1987)). In

keeping with this principle, we hold Buffa to no more and no less than the terms to which he agreed by signing the contract and guaranty.

New York law has explicitly and consistently upheld personal guaranties—particularly, absolute and unconditional guaranties of payment—that help to persuade a party to enter into a contract with a company for which the guarantor works, the required consideration being implicitly the same consideration as underlies the contract as a whole. Buffa fails to distinguish his guaranty from those that New York's codification of the Uniform Commercial Code identifies as presumptively valid or those that New York courts have held binding.

In sum, we find that defendants have failed to meet their burden of showing a genuine issue of material fact by seeking to disown the guaranty.

### 2. The Twenty–Five Percent Default Interest Rate

Defendants also seek to defeat plaintiff's motion for summary judgment on the ground that the twenty-five percent default interest rate prescribed by the Agreements is an unenforceable penalty. (Opp'n Mem. at 6–7). Paragraph 10(b) of the February 2011 Agreements states that

[a] default rate of interest of twenty-five (25) percent per annum shall immediately be imposed on the Option Price of all Common Shares and Warrant rights then still held and not previously sold by

Optionee, which shall apply from the date of default until full payment of all amounts due under this Agreement is made.

(Feb.2011 Agreements ¶ 10(b)). Under the terms of the contract, default results if defendants fail to meet their obligations according to the timeline set forth in paragraphs two and three. (See id. ¶¶ 2–3, 10).

■■■■ Defendants assert that "[o]nly in cases where the damages flowing from a breach would be difficult to ascertain, New York courts will give effect to a purported liquidated damages provision in a contract if it is a reasonable measure of the anticipated damages probable from a breach." (Opp'n Mem. at 7 (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 396, 690 N.Y.S.2d 854, 861, 712 N.E.2d 1220 (1999))). This policy, defendants contend, aims to preclude one party from compelling performance by the other through the imposition of a disproportionate penalty in case of breach. (*Id.*). Defendants allege that the default interest rate in the Agreements was established with compulsion rather than compensation in mind (*id.*), arguing that, "[a]t the time the option [was] executed, it could easily be discerned that damages would equal the difference between the value obtained for the stock and the price at which Endeavor was to purchase the stock. Therefore, the clause must be deemed an unenforceable penalty." (*Id.*).[8]

8. Defendants also contend that "[t]o the extent any interest would be due, it could have been predicted that 28 U.S.C. § 1961 would apply...." (Opp'n Mem. at 7). Defendants offer no caselaw in support of this contention. Simply put, section 1961 governs post-judgment interest; it is not the automatic prejudgment contractual gap-filler defendants suggest it to be. See 28 U.S.C. § 1961. Even if we were to accept defendants' invitation to thus expand the scope and influence of section 1961, however, their argument would fail nonetheless—the Second Circuit has indicated that parties may "contract out" of section 1961. See *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 101–02 (2d Cir.2004). Hence, the explicit and agreed-upon contractual rate of twenty-five percent would still govern the interest due here, inasmuch as it would operate to supplant the statutorily determinable rate.

In reply, plaintiff argues that defendants "consciously and deliberately agreed to a two-tiered interest rate structure," of which the higher default rate was a "bargained-for term intended to compensate AXA. [ ] for the losses caused by Defendants' previous breaches, and any additional breaches, of their obligations to honor the put options given to AXA [ ]." (Pl.'s Reply Mem. at 5). Plaintiff asserts, moreover, that the specific rate of twenty-five percent was chosen "because the AXA [ ] mutual funds that held the CAP shares that Endeavor defaulted on purchasing were then earning rates of return approximating 25%" (*id.*), though it offers no support for this claim. In exchange for this higher rate of interest, which would offset some of the risk to plaintiff by "compensat[ing] for Defendants' failure to meet their obligations in a timely fashion" (Pl.'s Reply Mem. at 3), "[t]he February 9, 2011 Agreements . . . provided Defendants with . . . AXA['s] forbearance in bringing litigation for Defendants' breach of the May 2009 agreements, additional time for Defendants to obtain the capital necessary to honor their obligations to AXA [ ], and an extended payment schedule." (*Id.*).

■ "Perhaps the most fundamental principle of contract construction is that 'when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms . . . .' " *South Side House*, 470 B.R. at 671–72 (quoting *Signature Realty, Inc. v. Tallman*, 2 N.Y.3d 810, 811, 781 N.Y.S.2d 259, 260, 814 N.E.2d 429 (2004)

(internal quotation marks omitted), and citing *Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 85 N.Y.2d 173, 182, 623 N.Y.S.2d 790, 794, 647 N.E.2d 1298 (1995)); *see also Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir.1992). This judicial deference to the plain language of contracts in general also applies to particular contractual provisions, such as designations of default interest rates—*see IRB–Brazil Resseguros, S.A. v. Inepar Invs., S.A.*, 83 A.D.3d 573, 575, 922 N.Y.S.2d 308, 312 (1st Dep't 2011) (suggesting that if the contract under consideration in that case had contained a "clear, unambiguous and unequivocal expression that interest will be paid at the rate higher than the statutory rate until the judgment is satisfied," then the stipulated rate would have been upheld)—and liquidated damages clauses.

■ Indeed, "New York law 'favors freedom of contract through the enforcement of stipulated damage provisions so long as they do not clearly disregard the principle of compensation.'" *L & L Wings, Inc. v. Marco–Destin Inc.*, 756 F.Supp.2d 359, 363 (S.D.N.Y.2010) (quoting *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380–81, 795 N.Y.S.2d 502, 507, 828 N.E.2d 604 (2005) (quoting 3 Farnsworth, Contracts § 12.18, at 303–04 (3d ed.))). "Parties to a contract have the right . . . to specify within a contract the damages to be paid in the event of a breach, so long as such a clause is neither unconscionable nor contrary to public policy." [9] *Id.* (quoting *Rattigan v. Commo-*

---

9. We need not linger over the public-policy question. Interest rates above twenty-five percent are void as criminally usurious under New York law. N.Y. Penal Law § 190.40. However, "it is well established that the usury statutes do not apply to defaulted obligations." *Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F.Supp.2d 556, 562 (S.D.N.Y. 2003) (citing cases). Courts accordingly have

upheld default interest rates that exceed twenty-five percent. *See, e.g., Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 333, 341 (S.D.N.Y.2008) (reversing a decision by a bankruptcy court that had "utilized New York usury law as a 'public policy benchmark' to guide its equitable determination" to lower a default interest rate of thirty-eight percent to twenty-five percent

*dore Int'l Ltd.,* 739 F.Supp. 167, 169 (S.D.N.Y.1990)).

▮▮▮▮ The enforceability of a damages clause is a question of law. *See The Edward Andrews Group, Inc. v. Addressing Servs. Co., Inc.,* 2005 WL 3215190, *6 (S.D.N.Y. Nov. 30, 2005) (citing cases). In assessing the enforceability of stipulated damages, courts "giv[e] due consideration to the nature of the contract and the circumstances." *L & L Wings,* 756 F.Supp.2d at 363–65 (S.D.N.Y.2010) (quoting *Bates Adver. USA, Inc. v. 498 Seventh, LLC,* 7 N.Y.3d 115, 120, 818 N.Y.S.2d 161, 163, 850 N.E.2d 1137 (2006) (internal quotation marks and citation omitted)). "[W]here there is doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damage clause, it should be resolved in favor of a construction which holds the provision to be a penalty." *Willner v. Willner,* 145 A.D.2d 236, 240–41, 538 N.Y.S.2d 599, 602 (2d Dep't 1989) (citations omitted). However, the fact that stipulated damages provide an incentive not to breach does not automatically render them a penalty where they are not "grossly out of scale with foreseeable losses." *Addressing Sys. & Prods., Inc. v. Friedman,* 59 A.D.3d 359, 360, 874 N.Y.S.2d 430, 431–32 (1st Dep't 2009) (citation omitted). Default interest rates are subject to the same level of scrutiny as other varieties of liquidated damages provisions. *See, e.g., Emigrant Funding Corp. v. 7021 LLC,* 25 Misc.3d 1220(A), 901 N.Y.S.2d 906, 906 (Sup.Ct. Queens Cnty., 2009) ("Parties are free to agree that a contract rate of interest shall increase upon default, so long as an interest rate is not usurious or does not constitute a penalty . . . . Clearly, if a mortgage contract provides for the application of a default rate of interest to apply upon acceleration, it will be that rate which prevails". (citations omitted)).

▮▮▮▮ It is the party contesting a liquidated damages provision that bears the burden of "proffer[ing] evidence that would allow a reasonable trier of fact to deny enforcement of the provision as unconscionable." *Edward Andrews Group,* 2005 WL 3215190, at *6 (citing *JMD Holding,* 4 N.Y.3d at 380, 795 N.Y.S.2d at 506, 828 N.E.2d 604); *see also L & L Wings,* 756 F.Supp.2d at 363–64; *GFI Brokers, LLC v. Santana,* 2009 WL 2482130, *2 (S.D.N.Y. Aug. 13, 2009). A party may meet its burden by demonstrating either that (1) the damages that would result from a breach were capable of estimation at the time at which the contract was forged, or (2) showing that the prescribed damages stand in evident disproportion to this anticipable injury. *See L & L Wings,* 756 F.Supp.2d at 363. In both cases, "the court must look to the anticipated loss discernible at the time of contracting and not the actual loss incurred by the breach to determine whether liquidated damages are reasonable or whether the damages are capable of calculation." *Vernitron Corp. v. CF 48 Assocs.,* 104 A.D.2d 409, 409, 478 N.Y.S.2d 933, 934 (2d Dep't 1984). Further, New York courts "also give due consideration to 'whether the parties were sophisticated and represented by counsel, the contract was negotiated at arms-length between parties of equal bargaining power, and . . . that [the provision] was freely contracted to.'" *L & L Wings,* 756 F.Supp.2d at 364 (quoting *Edward Andrews Group,* 2005 WL 3215190, at *6 n. 3). Here, defendants are unable to show that the liquidated damages provision in the 2011 Agreements is unconscionable.

---

because "New York usury laws do not apply to defaulted obligations"). Thus, there is nothing inherently amiss in the provision, and it will survive or fall based on a contextual determination with respect to enforceability.

Defendants' assertion that the parties could have foreseen that damages would equal the difference between the contract price and the price for which plaintiff was eventually able to sell the stock (Opp'n Mem. at 7) is unavailing. Opportunity costs can be unpredictable and run high, and courts have accordingly recognized a host of concerns that militate in favor of enforcing stipulated damages provisions. *See L & L Wings,* 756 F.Supp.2d at 364 (noting that loss of control of a trademark can result in incalculable harm to a license holder that lends itself to bargained-for damages); *Addressing Sys.,* 59 A.D.3d at 359, 874 N.Y.S.2d at 431 (upholding a provision governing damages resulting from a non-compete clause because such damages were incapable of estimation); *La Quinta Franchising, LLC v. Kettleman City Commercial, LLC,* 2008 WL 2073967, at *5 (May 14, 2008), *adopted,* 2008 WL 2477613 (E.D.Cal. June 16, 2008) ("The liquidated damages provision is intended to compensate for lost royalty fees, lost market penetration, lost goodwill in the area, lost opportunity costs and the expense of developing another facility in the market area."); *Holiday Hospitality Franchising, Inc. v. 174 W. St. Corp.,* 2006 WL 2466819, *8 (N.D.Ga. Aug. 22, 2006) (holding that three years of revenue does not constitute an unenforceable penalty in light of lost opportunity costs deriving from exclusion from a particular market). Here, the higher interest rate applicable upon default was selected to reflect and offset the opportunity loss plaintiff would suffer as a result of being deprived of prompt payment.

This increased rate, moreover, was agreed upon by two sophisticated and experienced parties of similar bargaining power. The *L & L Wings* court noted that, though "clearly not dispositive" as a consideration, "[m]uch of the traditional '[h]ostility to liquidated damages clauses reflects a concern that such clauses are often unconscionably imposed by the stronger, or more sophisticated party on the weaker.' " 756 F.Supp.2d at 365 (quoting *Jordache Enter., Inc. v. Global Union Bank,* 688 F.Supp. 939, 944 (S.D.N.Y. 1988)); *see also Addressing Sys.,* 59 A.D.3d at 360, 874 N.Y.S.2d at 431–32 (citing *Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 424, 427, 393 N.Y.S.2d 365, 369–70, 361 N.E.2d 1015 (1977)) ("Where, as here, the parties to the agreement were sophisticated business people, and the terms of the agreement were mutually negotiated, with each party represented by experienced counsel, a liquidated damages provision which is reached at arm's length is entitled to deference."). In this case, no disparity between the parties impugns the valid and binding agreement they reached, which includes the default interest rate of twenty-five percent.

Defendants fail to overcome the presumptive validity of the default-interest provision to which they assented by establishing that plaintiff's loss in the case of a breach was calculable or that the agreed-upon twenty-five percent interest rate is disproportionate to that foreseeable loss. Defendants offer no evidence to support their conclusory assertion that the default interest is punitive within the circumstances of this case, nor do they cite any authority that would indicate that the rate of twenty-five percent is unenforceable a *priori.* Absent such showings, the provision is enforceable as part of a clearly defined contract entered into by equals.

In sum, we find that the unambiguous provision setting forth the default interest rate of twenty-five percent reflects the manifest intent to shield plaintiff from risk in partial consideration for the extension of the option period, which allowed defendants to temporarily forestall litigation of

their default under the original contract. Such a rate is not independently unconscionable or void as against public policy, and it was agreed upon by two sophisticated parties at the time at which they forged the 2011 Agreements. We hold, therefore, that the interest-rate provision is no impediment to the upholding of a viable contract or to the granting of summary judgment to plaintiff.

Having found that plaintiff has met its burden in moving for summary judgment and that defendants have failed to raise any triable issues of fact, we grant summary judgment in favor of plaintiff.

## II. *Default Judgment*

In light of our determination that summary judgment in plaintiff's favor is warranted by the circumstances of this case, we need not address plaintiff's alternative motion for a default judgment.

### CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment is hereby GRANTED.