[828 NE2d 604, 795 NYS2d 502]

JMD Holding Corp., Respondent, v Congress Financial Corporation, Appellant, et al., Defendant.

Argued February 15, 2005; decided March 31, 2005

**POINTS OF COUNSEL**

*Otterbourg, Steindler, Houston & Rosen, P.C.,* New York City (*Richard G. Haddad, Daniel Wallen* and *Stuart J. Wells* of counsel), for appellant. I. Per se rules are disfavored and summary judgment was improperly granted. (*People v Selikoff,* 35 NY2d 227; *Teachers Ins. & Annuity Assn. of Am. v Butler,* 626 F Supp 1229; *Rodolitz v Neptune Paper Prods.,* 22 NY2d 383; *Millerton Agway Coop. v Briarcliff Farms,* 17 NY2d 57; *Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395; *F. Garofalo Elec. Co. v New York Univ.,* 300 AD2d 186; *Morris v Lenox Hill Hosp.,* 232 AD2d 184, 90 NY2d 953; *Friends of Animals v Associated Fur Mfrs.,* 46 NY2d 1065.) II. The early termination fee constituted an enforceable liquidated damages provision because the early termination of the loan deprived Congress Financial Corporation of the benefit of its bargain and was proportional. (*Simon v Electrospace Corp.,* 28 NY2d 136; *Brushton-Moira Cent. School Dist. v Thomas Assoc.,* 91 NY2d 256; *Kenford Co. v*

*County of Erie,* 73 NY2d 312; *Chapman v Fargo,* 223 NY 32; *Clement v Cash,* 21 NY 253; *Truck Rent-A-Ctr. v Puritan Farms 2nd,* 41 NY2d 420; *P.J. Carlin Constr. Co. v City of New York,* 59 AD2d 847; *Maas v Cornell Univ.,* 94 NY2d 87; *Dubiel v Parkchester Mgt. Corp.,* 284 AD2d 223; *In re United Merchants & Mfrs., Inc. v Equitable Life Assur. Socy.,* 674 F2d 134.) III. The lower courts erred by refusing to enforce the provisions of the amended loan agreement that gave Congress Financial Corporation the right to hold and apply funds for contingent obligations, including Congress's attorneys' fees in this action. (*Rodolitz v Neptune Paper Prods.,* 22 NY2d 383.)

*Loeb & Loeb LLP,* New York City (*David B. Eizenman, Paula K. Colbath* and *Ronald L. Israel* of counsel), for respondent. I. Section 12.1 (c) of the loan agreement is an unenforceable penalty. (*Truck Rent-A-Ctr. v Puritan Farms 2nd,* 41 NY2d 420; *Seidlitz v Auerbach,* 230 NY 167; *LeRoy v Sayers,* 217 AD2d 63; *Vernitron Corp. v CF 48 Assoc.,* 104 AD2d 409; *Bignall v Gould,* 119 US 495; *Whiteside v Rocky Mtn. Fuel Co.,* 101 F2d 765; *American Multi-Cinema, Inc. v Southroads, L.L.C.,* 119 F Supp 2d 1190; *Gilad Realty Corp. v Ripley Pitkin Ave.,* 48 AD2d 683; *Chrysler Credit Corp. v Dioguardi Jeep Eagle,* 192 AD2d 1066; *Gillman v Chase Manhattan Bank,* 73 NY2d 1.) II. The July letter agreement is an unenforceable agreement for a penalty. (*Motichka v Cody,* 5 AD3d 185; *Quaker Oats Co. v Reilly,* 274 AD2d 565; *Weiss v Weiss,* 206 AD2d 741; *Truck Rent-A-Ctr. v Puritan Farms 2nd,* 41 NY2d 420; *Seidlitz v Auerbach,* 230 NY 167.) III. Congress Financial Corporation's remaining arguments are wrong and irrelevant. (*Truck Rent-A-Ctr. v Puritan Farms 2nd,* 41 NY2d 420; *Dalston Constr. Corp. v Wallace,* 26 Misc 2d 698; *Public Serv. Mut. Ins. Co. v Goldfarb,* 53 NY2d 392; *Jarro Bldg. Indus. Corp. v Schwartz,* 54 Misc 2d 13; *LeRoy v Sayers,* 217 AD2d 63; *In re Trans World Airlines, Inc.,* 145 F3d 124; *Vernitron Corp. v CF 48 Assoc.,* 104 AD2d 409; *City of New York v Brooklyn & Manhattan Ferry Co.,* 238 NY 52; *Pyramid Ctrs. & Co. v Kinney Shoe Corp.,* 244 AD2d 625.) IV. JMD Holding Corp. was entitled to the money that Congress Financial Corporation withheld after the debt was paid in full. (*Hooper Assoc. v AGS Computers,* 74 NY2d 487; *Bonnie & Co. Fashions, Inc. v Bankers Trust Co.,* 955 F Supp 203.)

*Balber Pickard Battistoni Maldonado & Van Der Tuin, PC,* New York City (*Thomas P. Battistoni* of counsel), and *Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd.,* Chicago, Illinois (*Richard M. Kohn* and *Kenneth Ulrich* of counsel), for Com-

mercial Finance Association, amicus curiae. Early termination fees have been upheld as reasonable liquidated damages provisions. (*Walter E. Heller & Co., Inc. v American Flyers Airline Corp.*, 459 F2d 896; *In re United Merchants & Mfrs., Inc. v Equitable Life Assur. Socy.*, 674 F2d 134; *Boston Rd. Shopping Ctr. v Teachers Ins. & Annuity Assn. of Am.*, 13 AD2d 106.)

### OPINION OF THE COURT

READ, J.

In this action, JMD Holding Corp. seeks to recover $600,000 charged to its loan account by Congress Financial Corporation for early termination of the parties' $40 million commercial revolving loan agreement. After JMD paid off its outstanding loans, Congress also retained leftover funds in JMD's account as a cash collateral reserve to cover losses, including attorneys' fees, allegedly related to JMD's contingent obligations under the loan agreement. JMD also seeks to recover these funds. For the reasons discussed below, we conclude that JMD has not satisfied its prima facie burden to show that the $600,000 early termination fee is an unenforceable penalty. We also conclude that Congress was not entitled to keep the cash collateral reserve.

I.

On August 22, 1997, JMD's predecessor entered into a Loan and Security Agreement with Congress. Under the agreement, Congress agreed to make loans "from time to time in amounts requested by [JMD's predecessor]" in accordance with an asset-based lending formula and up to a maximum credit of $5 million. On January 20, 1998, JMD and Congress executed an Amended, Restated and Consolidated Loan and Security Agreement (Agreement) to increase JMD's maximum credit to $40 million. JMD committed to borrow from Congress to finance its working capital needs through the end of the Agreement's term on August 21, 2000, subject to renewal from year to year thereafter on at least 60 days' written notice.

To secure payment and performance of its obligations[1] under the Agreement, JMD granted Congress "a continuing security interest in, a lien upon, and a right of set off against" its assets, most pertinently including accounts receivable and inventory

---

1. The Agreement defined obligations to encompass loans, letter of credit accommodations and generally any other indebtedness owing by JMD to Congress, specifically including contingent obligations.

and their proceeds. The Agreement required JMD and its "account debtors" to direct all payments on accounts or payments constituting proceeds of other collateral into blocked bank accounts or "lockboxes." JMD agreed that all payments made into the lockbox were Congress's property. These funds were transferred or "swept" on a daily basis from the lockbox into Congress's bank account, and were applied by Congress to pay down the outstanding obligations in JMD's loan account, thus creating availability for new revolving advances.

Interest on the outstanding principal amount of noncontingent obligations was set at 1.5% above the prime rate per annum. At Congress's option and without notice, interest was set at 3.5% above the prime rate per annum on noncontingent obligations for the period from and after the Agreement's termination or nonrenewal or JMD's default until payment; and on any outstanding loans in excess of amounts JMD was eligible to borrow (e.g., advances in excess of amounts available to JMD under the Agreement's asset-based lending formula).

The Agreement afforded Congress seven nonexclusive remedies for JMD's breach, including the right to terminate.[2] Further, if the Agreement was terminated prior to the end of any term, JMD was required to pay Congress an early termination fee of between 1% and 2% of the $40 million maximum credit. The percentage decreased as the end of the Agreement's term drew closer; that is, the closer the termination to the end of a term, the lower the fee.

The Agreement recited that the early termination fee was required "in view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of [Congress's] lost profits as a result [of early termination]." Further, the fee was "presumed to be the amount of damages sustained by [Congress] as a result of such early termination," and JMD "agree[d] that

---

**2.** The other six remedies were the right to accelerate and demand immediate payment of all obligations; to enter upon any premises where collateral was located and take possession of it or complete processing, manufacturing and repair of all or any portion of it; to require JMD at its expense to make any part or all of the collateral available at a time and place of Congress's choosing; to foreclose upon any or all the collateral; to remove any or all of the collateral from the premises where it was located for purposes of sale, foreclosure or other disposition; and to sell, lease, transfer, assign, deliver or otherwise dispose of any and all collateral at such prices or terms as Congress deemed reasonable.

it [the early termination fee] [was] reasonable under the circumstances currently existing."

On June 22, 1999, Congress sent JMD notice of default in light of JMD's failure to comply with multiple provisions of the Agreement, including those governing collateral reporting and covenants as to accounts receivable and inventory; requirements to maintain minimum working capital and adjusted net worth; and delivery of required documentation, including audited financial statements and reports. JMD does not contest that it was in default. Congress accelerated the payment of all JMD's obligations and demanded their immediate repayment, one of its remedies under the Agreement.

As of the date of the notice of default, the early termination fee was $600,000 (1.5% of $40 million). On July 1, 1999, the parties executed a letter agreement, by which Congress agreed to forgive or discount the early termination fee if JMD paid off its indebtedness before September 3, 1999.[3] As it turned out, JMD did not pay all its outstanding obligations to Congress before the end of this grace period.

On November 10, 1999, Congress charged JMD's loan account in the amount of $600,000 for the early termination fee. JMD paid Congress all loan balances, both principal and interest, no later than November 23, 1999. Nonetheless, Congress continued to retain the remaining funds in JMD's loan account as a cash collateral reserve to cover losses, including attorneys' fees, purportedly related to JMD's contingent obligations.

On December 28, 2000, JMD commenced this action, which included causes of action asserting that Congress had converted approximately $800,000 of JMD's property and for money had and received in the same amount.[4] JMD moved for summary judgment on these claims, arguing that the early termination fee was an unenforceable penalty, not legitimate liquidated dam-

---

**3.** Under the letter agreement, Congress agreed to forgive the early termination fee entirely if JMD paid all its outstanding obligations by July 23, 1999. Congress further agreed to discount the fee to $150,000 if JMD paid after July 23, 1999 but on or before August 6, 1999; to $300,000 if JMD paid after August 6, 1999 but on or before August 20, 1999; and to $450,000 if JMD paid after August 20, 1999 but on or before September 3, 1999. Congress expressed its intention to look to JMD for the entire $600,000 early termination fee, however, if JMD did not pay all its outstanding obligations until after September 3, 1999.

**4.** The $800,000 comprises the $600,000 early termination fee and the funds retained by Congress as a cash collateral reserve, which the parties stipulated amounted to $131,443.40 as of the date JMD brought this lawsuit.

ages, and that Congress had no right to retain cash collateral. In support of its motion, JMD offered the affidavit of its president, who attested in conclusory fashion that, based on the memorandum of law prepared by JMD's attorney, the early termination fee was an "unenforceable penalty." He also alleged that Congress had offered "no legitimate basis whatsoever for its refusal to turn over" JMD's funds.

Relying on *Truck Rent-A-Ctr. v Puritan Farms 2nd* (41 NY2d 420 [1977]), Supreme Court concluded in July 2002 that "the liquidated damages clauses executed by the parties [were] so disproportionate from any potential damages suffered by Congress as to constitute an unenforceable penalty"; and that "Congress ha[d] not demonstrated that any issues of fact exist[ed] as to whether it [was] entitled to maintain a cash reserve" and "ha[d] not identified any additional obligations on JMD's part."[5] Supreme Court referred the issue of the amount of money to be returned by Congress to JMD to a special referee, who in May 2003 awarded JMD $820,256.41 plus interest at the statutory rate of 9% per annum from December 1, 1999 through entry of judgment. In September 2003, Supreme Court entered an order and judgment accepting the special referee's determination and awarding JMD $1,098,090.41.

In October 2003, the Appellate Division affirmed Supreme Court's award of partial summary judgment to JMD (309 AD2d 645 [1st Dept 2003]). In March 2004, the Appellate Division affirmed Supreme Court's order accepting the special referee's determination (5 AD3d 334 [1st Dept 2004]). We subsequently granted Congress leave to appeal.

## II.

■ This appeal principally involves a liquidated damages clause—the Agreement's provision for an early termination fee—considered by the courts below to be a penalty and therefore unenforceable. Whether the early termination fee represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances (*Mosler Safe Co. v Maiden Lane Safe Deposit Co.*, 199 NY 479, 485

---

5. Congress sought reargument, contending that Supreme Court had overlooked the fact that the maximum credit was raised from $5 million to $40 million, and that the court had erred in not considering this when evaluating the reasonableness of the liquidated damages provision. In April 2003, Supreme Court granted reargument, and adhered to its original decision.

[1910]; *Leasing Serv. Corp. v Justice*, 673 F2d 70, 74 [2d Cir 1982]). The burden is on the party seeking to avoid liquidated damages—here, JMD—to show that the stated liquidated damages are, in fact, a penalty (*P.J. Carlin Constr. Co. v City of New York*, 59 AD2d 847 [1st Dept 1977]; *Wechsler v Hunt Health Sys.*, 330 F Supp 2d 383, 413 [SD NY 2004]). Further, "[w]here the court has sustained a liquidated damages clause the measure of damages for a breach will be the sum in the clause, no more, no less. If the clause is rejected as being a penalty, the recovery is limited to actual damages proven" (*Brecher v Laikin*, 430 F Supp 103, 106 [SD NY 1977] [citations omitted]; *see also* 3 Farnsworth, Contracts § 12.18, at 304 [3d ed] [where a liquidated damages provision is an unenforceable penalty, "the rest of the agreement stands, and the injured party is remitted to the conventional damage remedy for breach of that agreement, just as if the provision had not been included"]).

In *Truck Rent-A-Center*, we characterized liquidated damages as "[i]n effect, . . . an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement" (41 NY2d at 424). We called the distinction between liquidated damages and a penalty "well established":

> "A contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation. If, however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced" (*id.* at 425 [citations omitted]).

Thus, JMD must demonstrate either that damages flowing from a prospective early termination were readily ascertainable at the time Congress and JMD entered into their revolving loan agreement, or that the early termination fee is conspicuously disproportionate to these foreseeable losses. Relatedly, we have cautioned generally against interfering with parties' agreements (*see Fifty States Mgt. Corp. v Pioneer Auto Parks*, 46 NY2d 573, 577 [1979] ["Absent some element of fraud, exploitive overreaching or unconscionable conduct . . . to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties"]; *cf.* 3 Farnsworth, Contracts § 12.18, at 303-304 [3d ed] ["(I)t has

become increasingly difficult to justify the peculiar historical distinction between liquidated damages and penalties. Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation"]; *see also XCO Intl. Inc. v Pacific Scientific Co.*, 369 F3d 998, 1002-1003 [7th Cir 2004] ["The rule (against penalty clauses) hangs on, but is chastened by an emerging presumption against interpreting liquidated damages clauses as penalty clauses"]).

Here, Congress committed to advance such sums as JMD might periodically request throughout the Agreement's entire term, based on an asset-based lending formula and up to a maximum credit of $40 million. The outstanding loan balance would fluctuate based on JMD's needs for working capital and the value of its collateral (e.g., accounts receivable), which secured the sums advanced and was applied to repay Congress so as to create availability for additional loans.

Under this asset-based financing arrangement, JMD only needed to borrow when and to the extent required for adequate cash flow to operate its business. As a result, JMD did not have to take out fixed loans in amounts sufficient to safeguard itself against short-term cash shortfalls or unanticipated contingencies, and thereby avoided unnecessary interest costs. In return for its commitment to make up to $40 million available to JMD for the Agreement's full term, Congress bargained for interest income over this entire time period.

JMD reasons that because it had the right but not the obligation to borrow—a signature feature of any commercial revolving loan agreement—Congress has no entitlement to liquidated damages in lieu of interest lost in the 13 months between the Agreement's early termination and the end of its contractual term. This is so, JMD argues, because Congress was never assured that JMD would ask it to advance any funds whatsoever, much less any particular amounts at any particular time or up to the $40 million maximum credit over this 13-month time period. Under this construct, Congress would necessarily never suffer damages on account of early termination. Having thus hypothetically reduced Congress's prospective damages to zero, JMD argues that the early termination fee obviously does not bear a reasonable proportion to the readily estimated probable loss from the Agreement's breach and its consequent early termination.

Of course, this argument begs the question of why JMD would ever have entered into a contract requiring it to pledge virtually

all its assets in order to obtain loans that it did not intend to request. JMD never offers any reason, much less proof, to suppose that at the outset of the parties' agreement it would have been reasonable to predict that JMD planned to borrow considerably less than the maximum credit or, put another way, that it was more likely that JMD intended to borrow amounts closer to nothing than to $40 million.[6] After all, the Agreement increased the maximum credit available to JMD eight-fold over the $5 million line of credit negotiated just five months earlier by its predecessor.

Further, JMD disregards Congress's costs to make $40 million available to loan. Congress had to have adequate funding in place to fulfill its obligation to lend up to $40 million to JMD upon request throughout the Agreement's term. This commitment created costs for Congress as well as diminished its capacity to make profitable loans to other entities. The Second Circuit in *Walter E. Heller & Co., Inc. v American Flyers Airline Corp.* (459 F2d 896, 899 [2d Cir 1972]) identified several similar elements of damages that were real but difficult to estimate ex ante and accordingly enforced $250,000 in liquidated damages for breach of an agreement to borrow $8.9 million to purchase a jet airplane. These damages included the lender's loss of interest over the term of the contract or, alternatively, until the borrower prepaid principal; that the lender "was, as of the signing of the contract, contractually limiting its lending activities so that the funds to be advanced to [borrower] might be available when needed by [borrower]"; and that if the transaction was not consummated, "the lender was faced with the cost and expense of procuring substitute . . . borrowers and the attendant delay in lending sums to be lent to [borrower]" (*id.* [internal quotation marks omitted]). Further, "when these factors are considered together with the fact that the sum arrived at was the product of an arms-length transaction between sophisticated businessmen, ably represented by counsel, the sum stated for liquidated damages does not seem to be a sum plainly

---

6. For example, JMD did not even present any suggestive proof on the issue, such as evidence of the sums it actually borrowed from Congress before the Agreement was terminated and, more relevantly, whether or how much money it may have borrowed elsewhere for working capital in the 13 months between the Agreement's early termination and the end of the contractual term. A wide disparity between the early termination fee and the interest that Congress earned or would have earned on these sums might support an inference that the estimate of harm underlying the liquidation of damages was not reasonable.

disproportionate to the possible loss" (*id.*). The lender's other conceivable but difficult to calculate losses included "rate of return, duration of the loan, risk, extent and realizability of collateral, and the other obvious uncertainties inherent in this particular contract," which made it "reasonable that a sum for liquidated damages should be agreed to after arms-length negotiations" (*id.* at 899-900; *accord In re United Merchants & Mfrs., Inc.*, 674 F2d 134 [2d Cir 1982]).

When Congress and JMD entered into the Agreement, they could not readily forecast the credit facilities for which JMD would qualify under the Agreement's asset-based formula, which would fluctuate over its term; how much JMD would actually borrow; whether the Agreement would be terminated early; and how much JMD would have borrowed if the Agreement had not been terminated early. Congress also, as already noted, was required to limit its lending activities to insure that adequate funds were available to fulfill its $40 million obligation to JMD, and would incur costs to procure substitute borrowers in the event that JMD breached the Agreement, causing Congress to terminate it. The Agreement therefore included an early termination fee of between 1% and 2% of the $40 million maximum credit, with the percentage decreasing as the Agreement's term approached. According to amicus Commercial Finance Association, an early termination fee structured as "liquidated damages . . . based on a sliding scale" and "linked to the amount of the commitment as opposed to the outstanding loan balance at any given time" is a common feature in asset-based lending facilities negotiated by sophisticated commercial parties.

To support its position, JMD also relies heavily on *Seidlitz v Auerbach* (230 NY 167 [1920]), a case in which we considered whether a $7,500 security deposit on a lease was enforceable as liquidated damages. When the lessee failed to pay one month's rent and was evicted, the landlord argued that it was entitled to the entire deposit. We disagreed:

> "[W]here a contract contains a number of covenants of different degrees of importance and the loss resulting from the breach of some of them will be clearly disproportionate to the sum sought to be fixed as liquidated damages, especially where the loss in some cases is readily ascertainable, the sum so fixed will be treated as a penalty. The strength of a chain is that of its weakest link" (*id.* at 173).

In *Hackenheimer v Kurtzmann* (235 NY 57 [1923]), however, we held that liquidated damages were enforceable for a material breach of a contract that, read literally, suggested their availability for trivial breaches as well. Otherwise, *Seidlitz* "may be pressed to so extreme a conclusion as to make it impossible to draw any contract providing for such [liquidated] damages" (*id.* at 67; *see also United Air Lines, Inc. v Austin Travel Corp.*, 867 F2d 737, 741 [2d Cir 1989] ["'(T)he presumed intent of the parties is that a liquidated damages provision will apply only to material breaches"]; 3 Farnsworth, Contracts § 12.18, at 311 n 31 [3d ed]).

JMD does not dispute that it breached multiple provisions of the Agreement, including those governing collateral reporting and covenants as to accounts receivable and inventory; requirements to maintain minimum working capital and adjusted net worth; and delivery of required documentation, including audited financial statements and reports. Nor does JMD dispute that, as a result of these breaches, it was in default and therefore Congress was entitled to terminate the Agreement. Angling for the protection of *Seidlitz*, however, JMD persistently characterizes its breaches, both individually and collectively, as minor recordkeeping deficiencies. But these breaches were material, given the nature of a commercial revolving loan agreement. For one thing, JMD neglected to provide Congress with the kind of information that any asset-based lender requires in order to track the movement and quality of its borrower's collateral and to determine loan availability accurately (*see generally* Levie, *Asset-Based Lending*, SB74 ALI-ABA 95 [May 15, 1997]).

The proponent of a motion for summary judgment "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact. Failure to make such prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986] [citations omitted]; *see also Friends of Animals v Associated Fur Mfrs.*, 46 NY2d 1065 [1979]). In this regard, CPLR 3212 (b) provides that a summary judgment motion "shall be supported by affidavit" of a person "having knowledge of the facts" as well as other admissible evidence (*see GTF Mktg. v Colonial Aluminum Sales*, 66 NY2d 965, 967 [1985]). A conclusory affidavit or an affidavit by an individual without personal knowledge of the facts does not estab-

lish the proponent's prima facie burden (*see e.g. Vermette v Kenworth Truck Co.*, 68 NY2d 714 [1986]).

The conclusory affidavit of JMD's president, which relied entirely on the memorandum of law prepared by JMD's attorney, provides no factual basis to support any conclusion that the early termination fee was an unenforceable penalty (*see e.g. Bush v St. Clare's Hosp.*, 82 NY2d 738 [1993]). JMD presented no proof to show that Congress's prospective damages upon early termination were capable of precise estimation at the time the parties executed the Agreement, or that the early termination fee was grossly disproportionate to this probable loss.

Congress, which did not cross-move for summary judgment, has asked us nonetheless to grant it this relief or, in the alternative, to determine that material triable issues of fact remain. While Supreme Court and the Appellate Division may search the record and grant summary judgment to a nonmoving party (*see* CPLR 3212 [b]), we may not (*Merritt Hill Vineyards v Windy Hgts. Vineyard*, 61 NY2d 106, 110-111 [1984]). Upon remittal of this matter to Supreme Court, however, Congress may seek summary judgment if it is so advised.

### III.

■ Finally, we conclude that Congress was not entitled to engage in self-help by retaining funds remaining in JMD's loan account after JMD had paid Congress all outstanding loans. Upon termination or nonrenewal of the Agreement and other related financing agreements—notably including security agreements—JMD was required to pay Congress all "outstanding and unpaid" obligations "in full." In addition, the Agreement required JMD to "furnish cash collateral" to Congress "in such amounts as [Congress] determine[d] [were] reasonably necessary" to secure itself against losses in connection with any of JMD's contingent obligations. In short, the Agreement provided for JMD to make cash collateral available to ensure its payment of any potential or not indefeasibly paid indebtedness still known to exist at the time Congress terminated its security interest in JMD's assets. This cash collateral was to be "remitted by wire transfer" by JMD to a bank account designated in writing by Congress for this purpose.

That is not what happened here. After paying off its indebtedness, JMD asked Congress to turn over surplus proceeds from deposits in the lockbox and provide a UCC-3 financing statement amendment to terminate Congress's security interest in

JMD's assets (see UCC 9-513 [c] [1]). Congress, for its part, offered to remit these monies and terminate its security interest upon JMD's execution of a release of claims. JMD refused to execute a release, and Congress retained the remaining funds in JMD's loan account as a so-called "cash collateral reserve" for payment of any contingent obligations that JMD might have owed it.

Congress subsequently substantially drew down the reserve, principally to pay for attorneys' fees related to either competing claims for the funds in JMD's account or this lawsuit. As justification for these charges to the reserve, Congress points to JMD's broad promise to indemnify it for losses, including attorneys' fees, incurred in connection with disputes related to the Agreement's "negotiation, preparation, execution, delivery, enforcement, performance or administration." While we conclude that the Agreement did not authorize Congress to retain and charge a reserve for these attorneys' fees, we view as a separate matter and express no opinion whether Congress may recoup any of its attorneys' fees by way of counterclaim or in a separate action for indemnification (see Hooper Assoc. v AGS Computers, 74 NY2d 487 [1989] [promise by one party to a contract to indemnify the other for attorneys' fees incurred in litigation between them must be unmistakably clear in order to be enforceable, such as where some of indemnified subjects are exclusively or unequivocally referable to claims between parties on the contract rather than claims of third parties]). This issue was beyond the scope of Supreme Court's reference to the special referee, who was limited to determining "the amount to be returned by Congress to JMD" from the cash collateral reserve retained by Congress.

Accordingly, the order of the Appellate Division should be modified, without costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO and R.S. SMITH concur.

Order modified, etc.