# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 40
The Trustees of Columbia
University in the City of New
York,
  Appellant,
 v.
D'Agostino Supermarkets, Inc.,
  Respondent.

Evan H. Krinick, for appellant.
Bruce H. Lederman, for respondent.

RIVERA, J.:

This appeal requires that we consider the propriety of a liquidated damages provision in a Surrender Agreement between two New York City icons: Columbia University, one of the City's premier universities, and D'Agostino Supermarkets, a family-

- 1 -

owned food market chain founded in 1932. As a general matter, "parties are free to agree

to a liquidated damages clause provided that the clause is neither unconscionable nor

contrary to public policy" (*172 Van Duzer Realty Corp. v Globe Alumni Student Assistance*

*Assn., Inc.*, 24 NY3d 528, 536 [2014] [internal quotation marks omitted] [citation

omitted]). The damages sought here were grossly disproportionate to the amount due upon

full performance of the Surrender Agreement. Therefore, the courts below properly struck

the provision as an unenforceable penalty in contravention of public policy. We affirm.

I.

Plaintiff The Trustees of Columbia University and defendant D'Agostino

Supermarkets, Inc., entered a 15-year commercial lease for defendant's rental of the ground

floor and basement levels of a building owned by plaintiff. Thirteen years into the tenancy,

with defendant facing financial difficulties, the parties entered a Surrender Agreement that

terminated the lease in exchange for defendant's surrender of the premises and a staggered

payment of $261,751.73.

The Surrender Agreement provides, in relevant part,

> "In consideration of Landlord entering into this Surrender
> Agreement, Tenant shall pay to Landlord (i) concurrently
> herewith an amount equal to Forty-Three Thousand and 00/100
> Dollars ($43,000.00) (the 'Initial Surrender Payment'), (ii) on
> or before June 1, 2016, an additional amount equal to Forty-
> Three Thousand and 00/100 Dollars ($43,000.00) (the
> 'Second Surrender Payment') and (iii) on the first day of each
> month during the period commencing on July 1, 2016, and
> ending on and including May 1, 2017, Fifteen Thousand Nine
> Hundred Seventy-Seven and 43/100 Dollars ($15,977.43)

(each such monthly payment described in this clause (iii), a 'Monthly Surrender Payment')."

In the event of defendant's default or failure to timely cure upon notice, the Surrender Agreement further provides,

> "the aggregate amount of all Fixed Rent, additional rent or other sums and charges due and payable during the term of the Lease shall immediately thereafter come due and payable by Tenant to Landlord and [] Tenant shall no longer be entitled to be released and relieved from and against any Released Claims . . . . TIME SHALL BE OF THE ESSENCE with respect to the dates set forth in this Section."

As agreed by the parties, defendant vacated and surrendered the premises to plaintiff within days of signing the Surrender Agreement and timely made the two $43,000 surrender payments. Plaintiff relet the premises one month after the surrender.

Defendant failed to timely pay the first four monthly surrender payments, from July to October 2016, despite plaintiff's notice to cure. In November 2016, plaintiff commenced the underlying action to enforce the damages provision in the Surrender Agreement. After defendant answered, plaintiff moved for summary judgment on the complaint seeking future payments under the terminated lease, i.e., $1,020,125.15, plus interest and other taxes and costs provided for under the lease.[1] Plaintiff rejected defendant's December 2020 tender of $175,751.73, which represented overdue and early payments of the remaining

---

[1] Plaintiff notes that the amount of prospective rent demanded in the complaint was an inadvertent error that plaintiff corrected in its summary judgment motion.

surrender installments.[2] Defendant cross-moved for summary judgment striking the

damages provision and seeking entry of judgment against itself for $175,751.73—the

outstanding amount due under the Surrender Agreement—along with accrued interest as

of October 14, 2016, or, in the alternative, denying plaintiff's motion and ordering

discovery on the issue of damages and mitigation based on the new lease.

Supreme Court denied plaintiff's motion for summary judgment and granted

defendant's cross-motion for summary judgment for the requested amount and interest.

The Appellate Division affirmed (168 AD3d 594 [1st Dept 2019]). We granted plaintiff

leave to appeal (33 NY3d 904 [2019]).

II.

A.

Plaintiff argues that the Surrender Agreement was a practical resolution of

defendant's breach of their commercial lease and so plaintiff's damages should be

measured against defendant's default on the lease. In the alternative, plaintiff requests that

we remand for a hearing to determine plaintiff's actual damages. Defendant counters that

the liquidated damages provision is grossly excessive and effectively a late fee of over

2000% per annum for failure to timely pay the monthly installments. Defendant also

---

[2] Defendant filed an amended answer and asserted a counterclaim for unjust enrichment
based on plaintiff's reletting of the demised premises during the lease term.

contends that plaintiff's actual damages were readily calculable and accounted for when the parties entered into the Surrender Agreement.

We conclude that the damages here are properly measured against defendant's breach of the Surrender Agreement and not, as plaintiff and the dissent maintain, against the breach of the terminated lease. Viewed in that light, we further conclude that the liquidated damages provision is an unenforceable penalty because it is plainly disproportionate to the damages for the only contractual breach at issue in this appeal, i.e., overdue payment of the monthly surrender installments.

On a motion for summary judgment, the moving party must "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Xiang Fu He v Troon Mgt., Inc.*, 34 NY3d 167, 175 [2019], quoting *Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). If the moving party proffers the required evidence, the burden shifts to the nonmoving party "to establish the existence of material issues of fact which require a trial of the action" (*Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012], quoting *Alvarez*, 68 NY2d at 324). Applying that standard here, because the damages provision is unenforceable, Supreme Court properly denied plaintiff summary judgment and properly granted defendant's motion, entering judgment for the unpaid amount under the Surrender Agreement plus interest.

B.

In accordance with the parties' commercial tenancy, in the event of a breach, plaintiff had two options: (1) allow defendant to maintain possession of the property for the full lease term and hold defendant liable for past and future rent, or (2) reenter the premises and collect all rent due up to the time of reentry. If it chose to reenter, plaintiff could relet the premises and defendant would be liable for any deficiency in rent and other related expenses. Instead of suing for a breach of the lease, the parties negotiated and entered into the Surrender Agreement, which provided that, on the date of surrender, the lease "and the term thereof and all rights of [defendant] thereunder shall expire and terminate." It further relieved defendant of its obligations under the lease, including payment of future rent and costs, in exchange for defendant's payments of certain fixed amounts totaling $261,751.73 and its surrender of the premises to plaintiff.

In other words, and as is commonly understood of these arrangements, the Surrender Agreement constituted a new contract between the parties that terminated the lease and all prospective obligations flowing from the tenancy (*see Holy Props. v Cole Prods.*, 87 NY2d 130, 133-134 [1995]; 52 CJS Landlord & Tenant § 206; 74A NY Jur2d Landlord and Tenant § 939; 49 Am Jur 2d Landlord and Tenant § 606). This new contract also included a liquidated damages provision.[3] Liquidated damages are "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be

---

[3]The dissent asserts that the parties have chosen the "ill-fitting" "label" of liquidated damages to describe the Surrender Agreement's damages clause (dissenting op at 7). The dissent stands alone in this view; in addition to the parties, all of the justices who have addressed the issue have treated this provision as a liquidated damages clause. Rightly so, because the provision sets forth the estimated compensation for a possible future breach.

sustained as a result of breach of the agreement" (*Truck Rent-A-Ctr. v Puritan Farms 2nd*, 41 NY2d 420, 424 [1977]). "A liquidated damage provision has its basis in the principle of just compensation for loss" (*id.*, citing Restatement of Contracts § 339, and Comment thereon). "Liquidated damages that constitute a penalty, however, violate public policy, and are unenforceable. A provision which requires damages 'grossly disproportionate to the amount of actual damages provides for [a] penalty and is unenforceable'" (*Van Duzer*, 24 NY3d at 536 [citation omitted], quoting *Truck Rent-A-Ctr.*, 41 NY2d at 424).

Defendant, as the party seeking to avoid payment of liquidated damages, has the burden of establishing that the damages for breach of the Surrender Agreement were disproportionate to the foreseeable losses and "in fact, a penalty" (*see JMD Holding Corp. v Congress Fin. Corp.*, 4 NY3d 373, 380 [2005]). Defendant met that burden.

The question here distills to whether the liquidated damages provision in the Surrender Agreement is so disproportionate to the anticipated harm to plaintiff from defendant's failure to timely pay the monthly installments that the provision constitutes a penalty. The damages provision effectively reinstated defendant's future rent liabilities under the terminated lease, to the tune of $1,020,125.15, plus interest and other prospective taxes and costs due under the lease, even though those damages did not flow from a breach of the Surrender Agreement. Those damages were 7½ times what plaintiff would have

received, if defendant had fully complied with the Surrender Agreement. Plaintiff cannot

enforce a non-existent lease under the guise of damages for a breach of a separate contract.[4]

To be clear, when the lease was in effect, plaintiff could have exercised its rights as

the landowner and proceeded against defendant for violating the leasehold terms (*see Van*

*Duzer*, 24 NY3d at 534-535). Instead, plaintiff negotiated with defendant to terminate the

lease in exchange for a set amount of money and surrender of the premises. That contract

freed plaintiff from its lessor obligations. Critically, contrary to the dissent's assertion that

plaintiff "received nothing in exchange" (dissenting op at 5), it allowed plaintiff to

immediately reenter and relet the premises without the need for litigation, which is exactly

what it did.

When defendant breached the Surrender Agreement, plaintiff was entitled to

proceed under that contract and demand damages for the breach, including the amount past

due and acceleration of the remaining installment payments. However, plaintiff could not

seek a payment grossly disproportionate to the amount past due plus interest (*see Bi-Econ.*

*Mkt., Inc. v Harleysville Ins. Co. of N.Y.*, 10 NY3d 187, 193 [2008] [recognizing that for

---

[4] The dissent attempts to create discord where none exists by stating that we reach our decision by casting aside principles of contract law (dissenting op at 4). But no one disputes that "[f]reedom of contract prevails in an arm's length transaction between sophisticated parties . . . , and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain'" (*159 MP Corp. v Redbridge Bedford, LLC*, 33 NY3d 353, 359 [2019], quoting *Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 695 [1995]). The dissent simply ignores that "[w]e have deemed a contractual provision to be unenforceable where the public policy in favor of freedom of contract is overridden by another weighty and countervailing public policy" (*id.* at 360), including a liquidated damages provision grossly disproportionate to the amount of actual damages (*see Van Duzer*, 24 NY3d at 536).

"agreements to pay"—i.e., "contracts for money only"—the only recoverable damage for breach is interest"]; *Scavenger, Inc. v GT Interactive Software Corp.*, 289 AD2d 58, 58-59, 734 N.Y.S.2d 141, 142 [1st Dept 2001] ["(W)here the breach of contract was a failure to pay money, plaintiff should be limited to a recovery of the contract amounts plus appropriate interest] [citation omitted]; *Cotheal v Talmage*, 9 NY [5 Seld] 551, 554 [1854] ["Where there is a contract to pay money, the damages for its breach are fixed and liquidated by law, and require no liquidation by the parties"]; 36 NY Jur 2d, Damages § 173 [stating that liquidated damages clauses in contracts for the payment of money are typically inappropriate because "for the nonpayment of money, the law awards interest as damages"]). By any measure the more than one million dollars plus interest demanded here is disproportionate to the $175,751.73 unpaid under the Surrender Agreement (*see e.g. TY Bldrs. II, Inc. v 55 Day Spa, Inc.*, 167 AD3d 679, 681 [2d Dept 2018] [holding that a late fee that would accrue on 27 days for a total of $1,350 was equal to, in effect, a 79% penalty for that month and thus unenforceable as against the public policy expressed by Penal Law § 190.40]; *Clean Air Options, LLC v Humanscale Corp.*, 142 AD3d 923, 924 [1st Dept 2016] ["The late fee, which according to the parties' calculations results in an annual interest rate of 78%, is unreasonable and confiscatory in nature, and thus unenforceable" (internal quotation marks omitted)] [citation omitted]; *Sandra's Jewel Box v 401 Hotel*, 273 AD2d 1, 3 [1st Dept 2000] [holding that a set-off of $15,000 exceeded the base amount due ($1,800 per month for five months), amounted to a 365% per annum penalty, and was unenforceable]; *Pyramid Ctrs. & Co. v Kinney Shoe Corp.*, 244 AD2d 625, 627 [3d Dept 1997] [holding that a liquidated damages clause providing for double the fixed minimum

rent upon surrender of the property was "not to provide just compensation but, rather to secure performance by the compulsion of the very disproportion"(internal quotation marks omitted)] [citation omitted]; *943 Lexington Ave. v Niarchos*, 83 Misc2d 803, 804 [App Term, 1st Dept, 1975] [holding that a rent surcharge of 60% per annum, was "unreasonable and confiscatory in nature and therefore unenforceable"] [citation omitted]).

A simple hypothetical further illustrates the penalizing nature of the liquidated damages provision here. According to plaintiff's interpretation of the Surrender Agreement, if defendant timely made all but the final monthly surrender payment of $15,977.43, defendant's breach would render it liable for $1,029,969.54 plus interest and additional costs. Defendant would be liable for the total amount remaining due under the terminated lease, and defendant would be forced to pay that amount, rather than the final installment, without having had the benefit of the premises which it had surrendered to plaintiff. There is but one way to refer to this outcome: an unenforceable penalty.

Our decision in *Van Duzer* is instructive. In that appeal, the defendants maintained that the landowner's acceleration of prospective rent was disproportionate to the landowner's actual damages where the landowner terminated the lease and relet the premises after the tenant vacated. Without deciding whether the amount sought was a penalty, we held that the defendants were entitled to a hearing to present evidence that the undiscounted accelerated rent was disproportionate to the landowner's actual losses, and thus constituted unenforceable liquidated damages. As we explained,

> "arguably the ability to obtain all future rent due in one lump
> sum, undiscounted to present-day value, and also enjoy

uninterrupted possession of the property provides the landowner with more than the compensation attendant to the losses from the breach—even though such compensation is the recognized purpose of a liquidated damages provision" (*Van Duzer*, 24 NY3d at 536-537).

The facts in this appeal present an even more obvious case of an unenforceable penalty. In *Van Duzer*, the landowner proceeded under the lease for damages flowing directly from the tenant's abandonment of the premises and noncompliance with the lease terms. Again, the payment plan in the Surrender Agreement here reflects the parties' negotiated damages for the breach of the lease, not the Surrender Agreement. The subsequent failure to pay installments on time is a breach of the Surrender Agreement, and a breach that is properly compensated by an award of the outstanding settlement payments plus interest.

The dissent maintains that the Surrender Agreement is best understood as a "settlement agreement" (dissenting op at 3). Why this would matter is unclear considering that a settlement agreement, like any other agreement, cannot be enforced if it violates public policy, including our state's rejection of penalties as damages (*see 1420 Concourse Corp. v Cruz,* 135 AD2d 371, 372 [1st Dept 1987] ["(W)here the parties, both represented by counsel, have freely entered into a stipulation of settlement in open court, such stipulation will generally be enforced unless public policy is affronted"]; *see e.g. SMD Capital Group LLC v EPR Capital LLC*, 45 AD3d 314, 314 [1st Dept 2007] [applying the test to determine the enforceability of a liquidated damages clause in a settlement agreement related to defendant's failure to produce the required books and records at the closing of a real estate transaction as required under a settlement agreement]; *Quaker Oats*

*Co v Reilly*, 274 AD2d 565, 566 [2d Dept 2000] [holding liquidated damages provision in settlement agreement regarding a mortgage foreclosure was unenforceable as grossly disproportionate and noting that "it is irrelevant that the plaintiff might have recovered much more had it continued with (the settled action)]").

Plaintiff unpersuasively argues and the dissent agrees that affirmance here would disincentivize landowners from entering surrender agreements and deprive tenants of the benefit afforded by such arrangements. Plaintiff chose to terminate the lease in exchange for a fixed amount paid in installments and reentry on the premises for purposes of entering a new lease with another tenant. The award of outstanding payments therefore allowed plaintiff to realize the benefit of its bargain under the Surrender Agreement and put the property to its highest and best use. This approach encourages surrender agreements as providing a benefit to all parties—the tenant is released from future liability and the landowner regains the premises and the opportunity to relet on its own account. In contrast, the dissent's approach would disincentivize tenants from negotiating a mutually agreeable surrender because the tenant would remain on the hook for back rent, future rent and other contractual damages without the benefit of enjoyment of the premises.

Plaintiff's real argument is that it did not receive six payments on time, but that was the risk that it accepted by entering the Surrender Agreement. A party's default is a risk common to all contracts, without unique effect in the context of a surrender of premises. And the existence of that risk does not and cannot justify exaction of a penalty.

Finally, plaintiff is not entitled to an evidentiary hearing to determine plaintiff's actual damages and the extent to which those damages were ascertainable at the time that the parties signed the Surrender Agreement.[5] Plaintiff's reliance on *Van Duzer* is misplaced. We remitted in *Van Duzer* to afford the breaching tenant an opportunity to present evidence in support of their contention that the undiscounted acceleration of all future rents constituted an unlawful penalty (24 NY3d at 532). In contrast, and notwithstanding the dissent's suggestion, Supreme Court here already completed the task that compelled remittal in *Van Duzer*, i.e., the determination that the liquidated damages provision was a penalty because plaintiff's damages were ascertainable and the liquidated damages were grossly disproportionate to the cost of breaching the Surrender Agreement.

## III.

Under our well-established rules of contract, the Surrender Agreement's liquidated damages provision does not fairly compensate plaintiff for defendant's delayed installment payments. The provision calls for a sum more than sevenfold the amount due if defendant had complied fully with the Surrender Agreement. We cannot enforce such an obviously and grossly disproportionate award without offending our State's public policy against "the imposition of penalties or forfeitures for which there is no statutory authority" (*Truck Rent-A-Ctr.*, 41 NY2d at 424, citing *City of Rye v Public Serv. Mut. Ins. Co.*, 34 NY2d 470, 472-

---

[5] While negotiating the Surrender Agreement, plaintiff was actively courting new tenants and has conceded that it did not suffer a differential in rent as a consequence of reletting shortly after defendant's surrender.

473 [1974]). Accordingly, there was no error in rejecting plaintiff's liquidated damages provision.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

DiFIORE, Chief Judge (dissenting):

After D'Agostino Supermarkets, Inc., the lessee of property owned by Columbia University, breached the lease by failing to pay rent for more than seven months, the parties settled their dispute by entering into a Surrender Agreement which contained certain conditions. If D'Agostino made timely installment payments totaling about $262,000,

representing the rent it already owed but had failed to pay, it would be relieved of certain other obligations stemming from its breach of the lease. However, if it failed to timely make the payments, D'Agostino would not "be released and relieved from" the claims Columbia possessed as a result of the breach of the lease, particularly the right (as described in the Surrender Agreement) to collect "the aggregate amount of all Fixed Rent, additional rent or other sums and charges due" during the remainder of the lease term (about two years). It is undisputed that, after entering the Surrender Agreement, D'Agostino again failed to uphold its end of the bargain, breaching the condition to timely make the back-rent installment payments. Yet the majority concludes, as a matter of law, that D'Agostino—a well-counseled, sophisticated party who freely negotiated the terms of the settlement—should be relieved of its obligation to accept the consequences of that second breach. This result is incompatible with our freedom of contract precedent and the strong public policy favoring enforcement of settlement agreements. Worse yet, I fear it will chill future efforts to resolve lease disputes without litigation—to the detriment of distressed tenants. Therefore, I respectfully dissent.

As this Court recently reaffirmed in *159 MP Corp. v Redbridge Bedford, LLC*, "'[f]reedom of contract prevails in an arm's length transaction between sophisticated parties . . . , and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain'" (33 NY3d 353, 359 [2019], quoting *Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 695 [1995]). The public policy underlying freedom of contract is twofold: "[b]y disfavoring judicial upending of the balance struck at the conclusion of the parties' negotiations" it "both

promotes certainty and predictability and respects the autonomy of commercial parties in ordering their own business arrangements" (*159 MP Corp.*, 33 NY3d at 359-360). Accordingly, "'when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms'" (*159 MP Corp.*, 33 NY3d at 358, quoting *Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]). This principle of New York contract law has "special import" in real property transactions where, as here, "commercial certainty is a paramount concern" (*159 MP Corp.*, 33 NY3d at 359, quoting *Vermont Teddy Bear*, 1 NY3d at 475).

The public policy favoring freedom of contract applies with particular force to the Surrender Agreement—which is a settlement agreement crafted by the parties to resolve their dispute without litigation. Settlement agreements "are judicially favored and may not be lightly set aside" (*IDT Corp. v Tyco Group, S.A.R.L.*, 13 NY3d 209, 213 [2009] [citation omitted]). Strict enforcement of settlement agreements serves multiple important purposes, consistent with those underlying freedom of contract. There is a "societal benefit in recognizing the autonomy of parties to shape their own solution to a controversy" and assurance that their agreements will be honored provides them "finality and repose upon which [to] order their affairs" (*Denburg v Parker Chapin Flattau & Klimpl*, 82 NY2d 375, 383 [1993]). Moreover, settlement agreements are favored because they also promote "efficient dispute resolution" (*IDT Corp.*, 13 NY3d at 213), "avoid[ing] potentially costly, time-consuming litigation and preserv[ing] scarce judicial resources" as "courts could not function if every dispute devolved into a lawsuit" (*Denburg*, 82 NY2d at 383; *see also IDT Corp.*, 13 NY3d at 213). As Columbia has consistently argued throughout this litigation,

these policies, and the significant interests they protect, should guide the resolution of this dispute between two sophisticated, counseled commercial entities.

The majority casts these principles aside, failing to acknowledge that the Surrender Agreement constituted a settlement of the claims Columbia possessed upon D'Agostino's breach of the lease, which included a right to collect—not only unpaid back rent—but also future rent owed until the conclusion of the lease term, even if D'Agostino vacated the premises (Columbia had no obligation under the lease to relet the property). Columbia agreed to settle under terms that significantly discounted the amount it would collect on account of D'Agostino's breach of the lease, but did so only on the condition that D'Agostino timely make eleven installment payments representing the back rent D'Agostino already owed at the time the parties entered the Surrender Agreement. Because that rent was several months overdue, it is no surprise that Columbia required the inclusion of a clause that "TIME SHALL BE OF THE ESSENCE with respect to the [due] dates" for those installment payments. The parties' agreement could not be clearer that Columbia waived certain claims it possessed arising from D'Agostino's breach of the lease *only* if this condition—timely payment of the installments—was met. Under the plain language of the agreement, upon D'Agostino's default or failure to timely cure upon notice, two things would occur: D'Agostino would immediately be obligated to pay the future rent due under the lease (among other associated payments) and it would "no longer be entitled to be released and relieved from and against any Released Claims." Of course, it is undisputed that D'Agostino breached yet again.

Notwithstanding the context of the Surrender Agreement and its plain language, the majority mistakenly concludes that the Surrender Agreement should be interpreted without reference to the prior breach of the lease and that D'Agostino was relieved of all obligations under the lease even if it failed to timely make the installment payments. Although the Surrender Agreement "terminated the lease," it most certainly did not unconditionally release the tenant of all obligations flowing from its breach of that prior agreement, and the majority's assertion that Columbia seeks to "enforce a non-existent lease under the guise of damages for a breach of a separate contract" (majority op at 8) misses the mark. Columbia does not attempt to enforce the lease—instead, it seeks to enforce the contingent remedy the parties adopted in the Surrender Agreement in the event D'Agostino failed to timely make the Surrender Payments.

The practical result of the majority's holding is that Columbia University received nothing in exchange for its agreement (1) to give the tenant additional time to make back rent payments that were already overdue, provided those payments were timely made, and (2) to forfeit its right to collect future rent from D'Agostino for its breach of the lease. Under the majority's analysis, the carefully negotiated consequence of D'Agostino's continued failure to pay the back rent is unenforceable; indeed, there is no consequence for D'Agostino's breach of the Surrender Agreement and D'Agostino is rewarded for serial breaches of valid and binding contracts. The majority accomplishes this result through a strained application of this Court's precedent related to liquidated damages clauses, reasoning that the provision reinstating D'Agostino's obligation to pay future rent in the event of a second breach operates as an unenforceable penalty because the damages

D'Agostino would be obligated to pay upon breach of the Surrender Agreement were substantially greater than the discounted damages Columbia agreed to accept in the form of promptly tendered installment payments. This remedy provision in the contract is best understood as a component of a settlement after a breach—not a liquidated damages clause crafted at the beginning of a contractual relationship. Nonetheless, even viewing the contingent language as a liquidated damages clause, when properly interpreted in the context of the entire agreement, it is not an unenforceable penalty justifying a deviation from application of our bedrock freedom of contract principles.

As we have recognized, the public policy favoring freedom of contract can be "overridden by another weighty and countervailing public policy" (*159 MP Corp.*, 33 NY3d at 360). The majority concludes that such a countervailing public policy is at play here, viewing the contingent remedy as an unenforceable liquidated damages clause. But "[a]s a general matter parties are free to agree to a liquidated damages clause 'provided that the clause is neither unconscionable nor contrary to public policy'" (*172 Van Duzer Realty Corp. v Globe Alumni Student Assistance Assn., Inc.*, 24 NY3d 528, 536 [2014], quoting *Truck Rent-A-Ctr. v Puritan Farms 2nd*, 41 NY2d 420, 424 [1977]). Liquidated damages provisions serve an important purpose because they allow parties to estimate—in advance of a default—the extent of the injury resulting from the breach of the agreement and are, therefore, particularly useful "where it would be difficult, if not actually impossible, to calculate the amount of actual damage" (*Truck Rent-A-Ctr.*, 41 NY2d at 424). Nevertheless, "public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority" (*id.*)—and thus, a liquidated damages

clause that operates as a penalty will not be enforced. A liquidated damages clause operates as an impermissible penalty only when it provides for damages "plainly or grossly disproportionate to the probable loss," as such a penalty "is not intended to provide fair compensation" (*id.* at 425). By comparison, it is enforceable when "the amount liquidated bears a reasonable proportion to the probable loss" (*id.*).

In this case, although the parties referred to the contingent remedy as a "liquidated damages clause," the label is ill-fitting. The public policy underlying our liquidated damages jurisprudence is simply not implicated in circumstances where, as in this case, there is no need to estimate the damages that might result in the event of a future breach because the breach has already occurred and the parties are crafting a settlement agreement. But even viewing the contingent remedy as a liquidated damages clause, the majority's conclusion that the provision reinstating D'Agostino's obligation to pay future rent is an unenforceable penalty because it provides for damages "exponentially disproportionate" to D'Agostino's outstanding Surrender Payments (approximately $1 million versus $176,000) adopts an overly simplistic view of the Surrender Agreement and fails to "giv[e] due consideration to the nature of the contract and the circumstances" in which it was entered, as our precedent requires (*172 Van Duzer Realty Corp.*, 24 NY3d at 536).[1] It is

---

[1] The majority reasons that the circumstances here are like that in *172 Van Duzer*—but it then fails to grant the relief provided in that case, which did not declare the provision unenforceable but, rather, remitted for a hearing to explore whether the damages were "grossly disproportionate." In fact, *172 Van Duzer* does not stand for the proposition that a provision is unenforceable merely because it required immediate payment of all future rent due under a lease. There, the acceleration clause was negotiated in advance of any breach, the default occurred early in the course of a long-term lease and, as the Court observed, strict enforcement of the provision would have resulted in a lump sum payment

evident from the Surrender Agreement that the parties understood that D'Agostino's liability for breach of the lease was much greater than the value of the Surrender Payments. The obligations triggered if those payments were not timely made were not included merely as compensation for breach of the Surrender Agreement but were also intended to compensate Columbia for D'Agostino's earlier breach of the lease. Thus, an analysis of whether the damages set forth in the Surrender Agreement are grossly disproportionate to Columbia's probable losses requires consideration not only of the value of the Surrender Payments that D'Agostino failed to make, but also of the probable damages already set in motion by D'Agostino's prior breach of the lease, viewed from the time the Surrender Agreement was executed and not the date of the breach (*see Truck Rent-A-Ctr.*, 41 NY2d at 425).

When the agreement was executed, Columbia possessed a right to pursue the full value of future rent payments until the conclusion of the lease term. At that time, there was no assurance that Columbia would sign a new tenant (and what costs might be incurred in that process), nor did the parties know the amount of rent Columbia might be able to negotiate or whether a new tenant would timely pay during the remainder of the original lease term. Thus, the remedy negotiated by the parties in the Surrender Agreement was directly premised on Columbia's rights under the lease, bears a "reasonable relation" to

---

of eight years of future rent, not discounted to present value (24 NY3d at 536). Even then we did not void the clause but directed further litigation of the issue—a remedy Columbia seeks in the alternative here. The majority inexplicably fails to explain why the hearing deemed necessary in *172 Van Duzer* is not afforded here, where the purported liquidated damages clause was negotiated after the tenant's initial breach with only about two years remaining on the lease.

Columbia's probable actual harm, and was intended to fairly compensate Columbia for that breach (*see generally Truck Rent-A-Ctr.*, 41 NY2d 420). Measured in a way that adequately recognizes the nature of the bargain struck in the Surrender Agreement, D'Agostino has not met its burden to show that the damages set forth in that agreement are so disproportionate as to operate as an unenforceable penalty (*see generally JMD Holding Corp. v Congress Fin. Corp.*, 4 NY3d 373, 380, 385 [2005]).

It is irrelevant that Columbia's actual damages here may ultimately be different than the amount D'Agostino agreed to pay in the contingent remedy provision of the Surrender Agreement. The enforceability of a liquidated damages clause does not turn on whether the remedy that the parties contemplated before the breach occurred is identical to the damages actually suffered. To impose such a requirement would obviate the entire purpose of such provisions, which is to reasonably estimate the damages that might result, permitting the parties to avoid the costs and uncertainty of litigating damages in the event of a future breach. For this reason, the rough relationship between the remedy in the contract and the damages flowing from a breach must be assessed based on the terms of the agreement and the information the parties possessed at the time it was executed—not with the benefit of hindsight based on post hoc proof of damages actually incurred.

Refusing to enforce the contingent remedy that the parties contracted for in their settlement agreement injects uncertainty into commercial tenancy agreements and the settlement of disputes thereunder, increasing the parties' transaction costs. It also rewards a sophisticated, represented party for breaching its validly-entered agreements. This will discourage commercial landlords from agreeing to settlements of this nature, to the

detriment of defaulting tenants like D'Agostino; limiting the damages recoverable when such settlements are breached to the discounted amount provided for in the restructured contract, even in the event of a new breach, removes any incentive for landlords to agree to settle by permitting tenants who have already defaulted to default again without recourse.

Because there was nothing unfair about the settlement crafted by these well-counseled sophisticated parties, public policy affords no basis to alter their contract. Since the back rent payments were already substantially overdue, Columbia reasonably sought assurance that D'Agostino would uphold its end of the bargain under the Surrender Agreement (something it failed to do under the lease). As reflected in the plain language of the agreement, Columbia was willing to forego pursuit of its then-existing right to collect *both* unpaid back rent and future rent only if D'Agostino timely made the back rent installment payments (the owner gave up its right to receive more money overall but would be assured of prompt payment of a discounted amount on a regular schedule, without the need for litigation). Of course, that is not what happened. By eliminating the element that induced the owner to give up its rights, the majority creates a distorted, one-sided settlement in which—despite its default—D'Agostino was able to enjoy the full benefit of the bargain. Because freedom of contract should "prevail[] in [this] arm's length transaction between sophisticated parties" (*159 MP Corp.*, 33 NY3d at 359) and there is no countervailing public policy basis that would justify relieving D'Agostino of the bargain it struck in the Surrender Agreement, I respectfully dissent.

Order affirmed, with costs. Opinion by Judge Rivera. Judges Fahey, Garcia and Feinman concur. Chief Judge DiFiore dissents in an opinion in which Judges Stein and Wilson concur.

Decided November 24, 2020